307 Ga. 444
FINAL COPY

S19A1201.  MORRALL v. THE STATE.

BOGGS, Justice.

Appellant Brandon Dewayne Morrall challenges his 2013 convictions for malice murder and a firearm offense in connection with the shooting death of Stephen "Tucker" Jackson. Appellant chose to represent himself on appeal, and his sole enumeration of error is that he was denied the effective assistance of counsel due to his trial counsel's failure to file a motion to prevent an eyewitness from identifying him at trial as the shooter. We affirm.[1]

---

[1] The shooting occurred on the night of October 6, 2011. On June 12, 2012, a Bibb County grand jury indicted Appellant and his younger brother, Devin Freeman, for malice murder, felony murder predicated on aggravated assault, and possession of a firearm during the commission of a felony. At the State's request, the trial court granted Freeman immunity and ordered him to testify at Appellant's trial, which took place from April 15 to 18, 2013. The jury found Appellant guilty of all charges. On April 24, 2013, the trial court sentenced Appellant to serve life in prison without the possibility of parole for malice murder and a consecutive term of five years for the firearm conviction; the felony murder verdict was vacated by operation of law. Appellant's trial counsel filed a timely motion for new trial. New counsel was appointed for Appellant, but Appellant requested that new counsel be removed and that he be allowed to represent himself at the motion for new trial hearing and on

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. In June 2011, two AK-47 rifles, a pump-action Mossberg shotgun, and a two-shooter derringer were stolen from Michael Warren's house in Macon. Warren reported them stolen to the police. Jackson told Warren that Appellant had one of the stolen AK-47s and took Warren to an apartment in the Bowden Homes housing project where Appellant was living with his girlfriend and young children. Warren pretended to be interested in buying the AK-47, and after examining the markings and serial numbers, Warren told Appellant that the AK-

appeal. The trial court held a hearing at which the court questioned Appellant and warned him of the risks and responsibilities of self-representation, see *Faretta v. California*, 422 U. S. 806, 818-821 (95 SCt 2525, 45 LE2d 562) (1975), and on September 28, 2018, the court granted Appellant's request to proceed pro se. On October 9, 2018, Appellant, acting pro se, filed an amended motion for new trial. On February 20, 2019, the trial court held a hearing on the motion at which Appellant's trial counsel testified. On March 4, 2019, before the court entered an order on the new trial motion, Appellant filed a premature notice of appeal. On April 18, 2019, the trial court entered an order denying the motion, and at that point, Appellant's notice of appeal ripened. See *Southall v. State*, 300 Ga. 462, 467 (796 SE2d 261) (2017) (holding that "a prematurely filed motion for new trial that sufficiently identifies the judgment involved becomes fully effective upon entry of that judgment"). The case was docketed in this Court to the August 2019 term and submitted for decision on the briefs.

47 was his gun and had been stolen. Appellant tried to take the AK-47 from Warren, but Warren had brought a .45-caliber handgun with him, which he produced. Appellant grabbed the handgun, and in the ensuing struggle, both Appellant and Warren were shot; Warren was hit in the foot, and Appellant was hit in the hand. Jackson and Warren then left the apartment, taking Warren's .45 and the AK-47 with them. Jackson told his aunt about the confrontation, and in the following months, he told her on three different occasions that he had run into Appellant and that Appellant had threatened to kill him.

On the night of October 6, 2011, Appellant, his brother Devin Freeman, and Demonquez Bell were drinking at Frank Nauer's house, where Freeman lived. Appellant was still angry at Jackson for bringing Warren to retrieve the stolen AK-47, and Appellant was rapping about wanting to kill Jackson, whom Bell had known his whole life. Bell tried to calm the situation down, telling Appellant that he needed to let go of his anger at Jackson, and Appellant started talking about fighting Jackson that night instead of shooting

3

him. When Appellant, Freeman, and Bell got ready to leave Nauer's house, Bell saw that Freeman was carrying a Hi-Point .45-caliber pistol. Bell was upset and asked why they were bringing a gun if Appellant only wanted to fight Jackson. Bell decided to follow Appellant and Freeman to make sure that they did not shoot Jackson.

Bell went with Appellant and Freeman across the street to Bowden Homes, where Appellant and Freeman looked for Jackson but did not find him. Appellant got a phone call, after which Bell noticed that Appellant and Freeman were smiling and Appellant was "amped up." Appellant and Freeman walked to a "bootleg house," where a crowd had gathered outside.[2] Bell followed and saw Jackson before Appellant and Freeman did. Jackson was standing at the driver's side window of an SUV parked under a streetlight, leaning into the SUV and talking to the occupants, Linda Willis and Travis Brown. Bell walked over to Jackson and tried to convince

---

[2] The testimony at trial described the bootleg house as a place where people played cards and alcohol was served.

Jackson to go with Bell inside the bootleg house for a drink, but Jackson declined. Bell went to the bootleg house, and Jackson continued talking to Willis and Brown.

Appellant then came up behind Jackson and shot him once in the head and three times in the back with the Hi-Point .45, killing him. Willis and Brown scrambled out of the passenger side door of the SUV and ran. As the crowd scattered, Appellant and Freeman fled back to Nauer's house, and Bell went home. Appellant called Bell later that night, admitted that he shot Jackson, and asked Bell, "[S]o who you love? Us or you love [Jackson]?"

Willis and Brown waited at the scene for law enforcement to arrive. Willis gave the police a description of the shooter that matched Appellant, and at the police station, she picked Appellant's photo out of a six-man photo lineup as the man who shot Jackson. Brown lived around the corner from Appellant and had known him for ten years, and Brown saw that Appellant was the shooter. But because Brown was afraid for his life, he told the police that night that he did not see who the shooter was.

On October 18, 2011, Appellant bought a one-way bus ticket to Tampa, Florida, under a fake name. He stayed in Florida until October 21, 2011, when he came back to his sister's house in Macon. The fugitive squad arrested Appellant there later that day.

More than a year after the shooting, Brown was in jail serving a sentence for simple battery and awaiting trial on other charges when he contacted his attorney and said that he needed to speak with the District Attorney's office. On March 14, 2013, Brown told a detective and an investigator from the District Attorney's office that, contrary to his statement to the police on the night of the shooting, he did see who shot Jackson, and that Appellant was the shooter.

At trial, Warren testified about his confrontation with Appellant over the AK-47, and Bell testified about the events leading up to the shooting. Willis and Brown identified Appellant in court as the person who came up behind Jackson and shot Jackson repeatedly. Jackson's aunt testified that Appellant threatened to kill Jackson on three different occasions. Billy Alan West, who was in a holding cell at the courthouse with Appellant before the trial

6

started, testified that Appellant said that he was "coming to court for a body," that he confronted Jackson at a bootlegger's house with a .45-caliber gun, that he had argued over "some kind of AK weapon" with one of the people who was going to testify against him, and that "he was confident that he was gonna beat the case in trial" because the State did not have any physical evidence connecting him to the shooting. A firearms examiner testified that four shell casings found between Jackson's body and the SUV, two bullets found inside the SUV, and one bullet found on the street, as well as a bullet that the medical examiner recovered from Jackson's body during the autopsy, were all fired from the same gun, and that the marks he found on the bullets and shells were consistent with being fired from a Hi-Point .45 pistol. The State also introduced into evidence a letter that Appellant wrote to Freeman from jail telling Freeman to offer Bell $1,500 to sign a statement saying: "I did not see Brandon Morrall with a gun or heard [sic] him rap about killing Stephen Tucker Jackson on October 6, 2011. I was mistaken."

Appellant testified at trial, claiming that he was asleep at his

sister's house when the shooting occurred. His sister testified that he came to her house on the night of the shooting around dusk, talked to her and her children for a while, and then took a pain pill and went to bed. She said that she could see the front door from the living room where she was watching television and that Appellant did not leave the house from the time that he went to bed until after the shooting, when someone came to her house to tell her about it.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's usual practice in murder cases, we have reviewed the record and conclude that, when properly viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or

8

inconsistencies in the evidence." (citation and punctuation omitted)).

2. Appellant contends that he was denied the effective assistance of counsel due to his trial counsel's failure to file a motion to prevent Brown from identifying Appellant as the shooter at trial. To prevail on this claim, Appellant must prove both that his counsel's performance was constitutionally deficient and that the deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that his counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, Appellant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. We need not "address both components of the

inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Appellant claims that his trial counsel, Tamika Fluker, was constitutionally deficient in failing to file a motion to suppress an in-court identification by Brown of Appellant as the shooter. Appellant cites *Neil v. Biggers*, 409 U. S. 188 (93 SCt 375, 34 LE2d 401) (1972), and argues that Brown's in-court identification of him as the shooter violated his right to due process because Brown knew that Appellant had been arrested for the shooting before Brown made his statement on March 14, 2013, in which he identified Appellant as the shooter. But *Neil* and other decisions in the same line, beginning with *Stovall v. Denno*, 388 U. S. 293 (87 SCt 1967, 18 LE2d 1199) (1967), address the due process concerns that can arise from an arranged pretrial viewing of a defendant for purposes of identification by a victim or witness, either in person (a corporeal identification) or in a photograph or set of photographs (a photographic identification). See *Simmons v. United States*, 390 U. S. 377, 386 n.6 (88 SCt 967, 19 LE2d 1247) (1968) (discussing pretrial corporeal and

photographic identifications). Appellant does not claim that Brown's statement on March 14, 2013, was accompanied by a viewing of Appellant either in person or in a photograph. The fact that Brown knew that Appellant had been arrested for the shooting before Brown gave a statement identifying Appellant as the shooter does not implicate the due process concerns addressed by *Neil* and other decisions in the same line.

Appellant also claims that Brown's in-court identification of him as the shooter violated his right to due process because he and Brown were in jail at the same time, encountered each other twice, and talked about the shooting both times. Appellant acknowledges that the encounters, which he calls "suggestive," were not orchestrated by the police and instead were "inadvertent[,] accidental encounters." But he argues that the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence, and that courts therefore should scrutinize all suggestive pretrial identification procedures, not just those that were orchestrated by the police. However, the United

States Supreme Court rejected this exact argument in *Perry v. New Hampshire*, 565 U. S. 228 (132 SCt 716, 181 LE2d 694) (2012). In *Perry*, the Court said:

> We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers. Petitioner requests that we do so because of the grave risk that mistaken identification will yield a miscarriage of justice. Our decisions, however, turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or photograph array. When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at post-indictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

Id. at 232-233 (footnote omitted). Fluker cross-examined Brown about his conflicting statements regarding whether he saw the shooter and his belated identification of Appellant as the shooter in his March 14, 2013 statement and at trial.

In short, Fluker reasonably could have determined that a motion to suppress an in-court identification by Brown of Appellant

12

as the shooter on due process grounds would have failed. It follows that Appellant cannot show that Fluker was constitutionally deficient in not filing such a motion. See *Premo v. Moore*, 562 U. S. 115, 124 (131 SCt 733, 178 LE2d 649) (2011) (stating that in determining whether counsel was constitutionally deficient for failing to file motion to suppress allegedly improperly obtained confession, "the relevant question under *Strickland*" is whether "no competent attorney would think a motion to suppress would have failed"). See also *Sexton v. Beaudreaux*, 585 U. S. ___ (138 SCt 2555, 2559, 201 LE2d 986) (2018) (citing *Premo* in context of claim of ineffective assistance of counsel for failure to file motion to suppress allegedly tainted identification testimony). Accordingly, Appellant's ineffective assistance of counsel claim fails.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 18, 2019.
Murder. Bibb Superior Court. Before Judge Simms.
Brandon D. Morrall, *pro se*.

13

*K. David Cooke, Jr., District Attorney, Sandra G. Matson, Dorothy V. Hull, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General*, for appellee.