**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: May 17, 2022

S22A0261.  NEAL v. THE STATE.

BOGGS, Presiding Justice.

Appellant Anighyah Neal challenges his 2018 convictions for felony murder and possession of a firearm during the commission of a felony in connection with the shooting death of Lance Williams. Appellant contends that the evidence was legally insufficient to support his convictions, that the trial court violated his constitutional right to be present at four bench conferences during voir dire, and that he was denied the effective assistance of counsel at trial. However, the evidence was sufficient to support Appellant's convictions, the record fully supports the trial court's finding that Appellant acquiesced in his counsel's waiver of his right to be present at the bench conferences, and Appellant has not met his

burden to show that he received ineffective assistance of counsel. Accordingly, we affirm.[1]

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. Appellant and VonEric

---

[1] Williams was killed on July 8, 2016. Later that year, a Houston County grand jury indicted Appellant, VonEric Richardson, and Kadarius Kendrick for felony murder and other crimes in connection with the shooting. On September 21, 2017, Richardson pled guilty to reduced charges and agreed to testify for the State. The State decided to try Appellant and Kendrick separately, and on March 6, 2018, the grand jury returned an indictment against Appellant for two counts of felony murder, armed robbery, aggravated assault with a deadly weapon, and two counts of possession of a firearm during the commission of a felony. The State then secured the entry of a nolle prosequi on the original indictment as to Appellant, leaving the original indictment pending against Kendrick alone. Appellant was tried from April 16 to 19, 2018. Despite the pending charges against Kendrick, he testified as a witness for the defense without a grant of immunity and for the State on rebuttal. The jury acquitted Appellant on the armed robbery and related felony murder and firearm possession counts but found him guilty of the remaining charges. The trial court sentenced Appellant to serve life in prison for felony murder and a consecutive term of five years for possession of a firearm during the commission of a felony; the aggravated assault count merged. On May 2, 2018, Appellant filed a motion for new trial, and on May 11, 2018, he filed a premature notice of appeal. On February 9, 2021, Appellant amended his new trial motion through new counsel. After an evidentiary hearing, the trial court denied the motion on July 12, 2021. At that point, Appellant's premature notice of appeal ripened. See *Morrall v. State*, 307 Ga. 444, 445 n.1 (836 SE2d 92) (2019). See also *Southall v. State*, 300 Ga. 462, 465 (796 SE2d 261) (2017) ("[W]e properly treat a premature notice of appeal . . . as effectively filed, vesting jurisdiction in the appellate court, upon entry of . . . an order denying a motion for new trial."). Appellant filed an additional notice of appeal on July 13, 2021. The case was docketed in this Court for the term beginning in December 2021 and submitted for decision on the briefs.

Richardson sold Xanax for Williams, who also sold marijuana and was known to have guns and carry cash. Around midday on July 8, 2016, Richardson borrowed his girlfriend's maroon Mercury Sable, picked up Appellant and Kadarius Kendrick in Perry, and drove to Williams' house in Byron. Williams got in the car, and Richardson drove to the Academy Sports store in Warner Robins, where Williams bought a box of .45-caliber cartridges and a box of .40-caliber cartridges. Richardson then drove back to Williams' house, where Richardson and Kendrick waited in the car while Appellant and Williams went inside.

Appellant and Williams walked through the living room and down a hallway to Williams' bedroom, where Williams put the bag containing the boxes of bullets on top of a stack of shoeboxes in his closet. There were two unloaded guns lying on the bed: a .45-caliber pistol and a .40-caliber pistol. As Appellant and Williams were talking, Williams took ten cartridges out of the box of .45-caliber cartridges, loaded the .45-caliber pistol, and laid the pistol back on the bed. Appellant then picked up the .45-caliber pistol and,

standing at the end of Williams' bed, fired twice at Williams, who was eight inches shorter than Appellant. One bullet struck Williams on the upper right side of his chest and travelled at a downward angle through his right lung, aorta, and left lung before exiting the left side of his back. Appellant ran out of the bedroom, through the hallway, and into the living room, where he tried to leave through the front door but could not get the storm door open. Williams managed to grab a loaded .22-caliber revolver from his closet and follow after Appellant, who shot twice more at Williams in the living room, missing both times. Appellant ran to the bathroom in the master bedroom and broke through a window into the backyard as Williams collapsed on the living room floor by the front door and died.

Craig Hughes, who lived two doors down from Williams, was in his backyard and heard the glass break when Appellant came through the window. Appellant jumped over a privacy fence, ran across Hughes' backyard, and jumped over a gate into Hughes' front yard. Hughes called out to Appellant, but Appellant did not respond,

4

so Hughes followed Appellant into the front yard and asked Appellant what he was doing. Appellant turned to face Hughes, "moved his hand towards his pocket as if he had a weapon," and threatened to "kill" Hughes. Appellant did not make any claim that somebody just shot at him, that somebody was trying to get him, or that he was in fear for his life. Hughes saw a maroon Mercury Sable come around the curve from the direction of Williams' house, Appellant got into the backseat, and the car sped off. Hughes ran behind the car long enough to get the license plate number and went inside his house and called 911; a recording of the 911 call was later played for the jury.

Richardson drove back to Perry and stopped at the house of a friend, Brandon Peavy, who lived across a field from Richardson. Appellant asked Richardson to borrow some clothes, so Richardson walked to his house and brought back some clothes, which Appellant changed into. Appellant took the clothes that he was wearing when he shot Williams and threw them in a fire barrel in Peavy's backyard. When Peavy checked his cell phone and learned that

5

Williams had been killed, Peavy relayed the information to Richardson, Kendrick, and Appellant, but they did not say anything. Several hours later, Appellant called a childhood friend, Cyntavious Mumphery, who was also Williams' nephew, and asked for a ride to Atlanta. On the way to Atlanta, Williams' brother called Mumphery and told him that Appellant was the person who killed Williams. Mumphery stopped at a gas station, made Appellant get out of the car, and fought with Appellant. After the fight, Appellant got his bag out of Mumphery's car, threatened Mumphery, and fled on foot.

Shortly after the shooting, responding officers found Williams lying on his back in a pool of blood just inside the front door. A fully loaded .22-caliber revolver was on the floor near Williams' right hand. Outside, on the ground beneath a window on the back of the house, the officers found broken glass and a magazine containing five .45-caliber cartridges. A search of the yard did not yield any firearms. A crime scene investigator recovered two .45-caliber shell casings from the floor in the living room. In Williams' bedroom, the crime scene investigator recovered an empty .40-caliber pistol from

the bed and two .45-caliber shell casings from the floor. Both rounds fired in the bedroom went through the closet door, which was open, and into the wall. Based on the height of the bullet holes, the crime scene investigator determined that both bullets were traveling at a downward trajectory. There was no physical evidence at the scene that either the .40-caliber pistol or the .22-caliber revolver had been fired.

Appellant was arrested in the Atlanta area five days after the shooting, on July 13, 2016. The lead investigator, Shane Mann, interviewed Appellant. The interview was video recorded and later played for the jury. In the interview, Appellant claimed that after Williams loaded the .45-caliber pistol, he put it down on the bed beside the .40-caliber pistol and then asked Appellant about $200 that Appellant owed him. Appellant said that when he denied owing Williams any money, Williams picked up the .40-caliber pistol from the bed, pointed it at Appellant, and demanded that Appellant give him everything in his pockets. Appellant claimed that he said, "No," and started to leave the room, and Williams fired the .40-caliber

7

pistol at Appellant. Appellant said that after he heard the "boom" and his ears started ringing, he lay down on the floor at the end of the bed. According to Appellant, he reached up from the floor, grabbed the .45-caliber pistol off the bed, and blindly fired the gun towards the ceiling before getting up and running into the living room. Appellant also claimed that Williams shot at him again in the living room, that he dropped the .45-caliber pistol and the magazine after he broke through the window, and that he told Hughes that someone was shooting at him.

Appellant testified at trial and again claimed self-defense. Appellant testified that he shot Williams from a crouching position at the end of the bed after Williams pointed the .40-caliber pistol at him and "pulled the trigger." Appellant admitted that Williams never fired a shot at him, that the reason his ears were ringing was because he shot at Williams, that he fled the scene and changed his clothes, and that he did not call 911 to report the incident. The court charged the jury on self-defense.

8

When properly viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find beyond a reasonable doubt that Appellant did not shoot Williams in self-defense and that Appellant instead was guilty of the crimes for which he was convicted. See *Jackson v. Virginia,* 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Anthony v. State*, 298 Ga. 827, 829 (785 SE2d 277) (2016) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense."); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.   Appellant contends that the trial court violated his constitutional right to be present by excluding him from four bench conferences during voir dire at which counsel for the parties discussed with the court whether certain prospective jurors should be struck for cause. See *Wade v. State*, 12 Ga. 25, 29 (1852) (holding

9

that a criminal defendant has "the right to be present, and see and hear, all the proceedings which are had against him on the trial before the [c]ourt" (emphasis omitted)). See also *Murphy v. State*, 299 Ga. 238, 241 (787 SE2d 721) (2016) (holding that "appellant clearly had the right to be present for and to hear the matters discussed in the bench conferences" that "occurred during jury selection, at a time when the trial judge and counsel were discussing potential motions to strike venire members following the general voir dire"). However, the trial court found that Appellant acquiesced in his counsel's waiver of his right to be present at these conferences, and the record supports the trial court's finding. See *Champ v. State*, 310 Ga. 832, 841 (854 SE2d 706) (2021) (explaining that determining whether a defendant acquiesced to counsel's waiver of the defendant's right to be present "is often highly fact-specific," and that "the trial court's findings of fact on the issue will be upheld on appeal unless clearly erroneous").

It is well established that "the right to be present belongs to the defendant, and he is free to relinquish it if he so chooses."

10

*Hampton v. State*, 282 Ga. 490, 492 (651 SE2d 698) (2007).

> A defendant may relinquish his right in several ways: if he personally waives the right in court; if his counsel waives the right at his express direction; if his counsel waives the right in open court while he is present; or, as seen most commonly in our case law, if his counsel waives the right and the defendant subsequently acquiesces to that waiver.

*Champ*, 310 Ga. at 841.

The record does not show that Appellant personally waived his right to be present at the bench conferences during voir dire or that his counsel waived that right at Appellant's express direction or in open court while Appellant was present. The record does show, however, that Appellant was in the courtroom when the bench conferences occurred and that his counsel participated in the conferences without objecting to Appellant's absence from them. Thus, the question is whether Appellant subsequently acquiesced in his counsel's waiver of his right to be present. See *Murphy*, 299 Ga. at 241 ("Acquiescence may occur when counsel makes no objection [to the defendant's absence] and [the] defendant remains silent after

11

he or she is made aware of the proceedings occurring in his or her absence.").

Appellant argues that he could not have acquiesced because he did not know what happened at the bench conferences. However, this argument is belied by the record. At the motion for new trial hearing, Appellant's trial counsel testified on direct examination that he would "not be surprised" if he did not tell Appellant the results of the four bench conferences during voir dire. On cross-examination, the State asked whether, after the bench conferences, he "went back and talked to [Appellant] about the particular issue involving the juror that was being discussed." Appellant's trial counsel answered that he misunderstood the question on direct examination and did not realize that he was being asked specifically about the bench conferences during voir dire. He continued, "[I]f it was voir dire and if an issue arose and if [Appellant] did not accompany me to the bench conference[,] I'm confident I advised him of whatever just happened at the bench." Appellant also testified at the motion for new trial hearing and was asked whether, after the

12

bench conferences during voir dire, his trial counsel would come back and tell him "what happened at those conferences." Appellant replied, "Yeah, he would tell me what happened."

The trial court found in its order denying Appellant's new trial motion that Appellant "was informed by trial counsel as to the substance of each bench conference," and that "he acquiesced to counsel's waiver of his presence by failing to voice any objection – either directly or through counsel – to his absence." The record fully supports the trial court's findings in this regard. Accordingly, this claim provides no basis for reversal. See *Champ*, 310 Ga. at 841.

3.     Appellant also contends that he was denied the effective assistance of counsel at trial. We disagree.

A convicted defendant's claim that his attorney's assistance was so defective as to require reversal of his conviction must prove both that the attorney's performance was professionally deficient and that this deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, the defendant must

13

show that his counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This burden, though not impossible to carry, is a heavy one." *Ellis v. State*, 292 Ga. 276, 283 (736 SE2d 412) (2013). Appellant has not carried that burden.

Appellant claims that his trial counsel was professionally deficient in failing to move to strike a juror after it was discovered on the second day of trial that she knew some members of the victim's family. However, contrary to Appellant's assertion, the juror was not asked during voir dire if she knew any members of the victim's family. Cf. *Moon v. State*, 312 Ga. 31, 48-49 & n.8 (860 SE2d 519) (2021) (explaining that lying or purposefully withholding material information that either the court or counsel specifically

14

asked the prospective jurors to disclose during voir dire can provide a sound legal basis to excuse even a deliberating juror). A juror's non-familial relationship with the victim provides a basis for disqualification only if it is shown that the relationship caused the juror to have a fixed opinion of the defendant's guilt or innocence or a bias for or against the defendant. See *Veal v. State*, 301 Ga. 161, 165 (800 SE2d 325) (2017). As a result, merely knowing the victim, much less the victim's relatives, is not a sufficient basis to strike a juror or prospective juror for cause. See *Coe v. State*, 293 Ga. 233, 236 (748 SE2d 824) (2013) (juror); *Cammon v. State*, 269 Ga. 470, 473 (500 SE2d 329) (1998) (prospective juror).

Here, when the issue came to the trial court's attention, the court questioned the juror on the record but outside the presence of the other jurors, and the juror explained that she did not know the victim, that she knew three members of the victim's family, and that her relationships with the victim's family members would not cause her "any problem whatsoever in being a juror in this case and being fair and impartial to both sides." In light of the juror's answers,

15

which the court found to be credible, as well as the lack of any evidence in the record that the juror held a fixed opinion of Appellant's guilt or innocence, Appellant has not shown that his counsel was professionally deficient in failing to move to strike the juror. See *Moss v. State*, 298 Ga. 613, 618 (783 SE2d 652) (2016) ("A lawyer is not required to make an objection that he reasonably believes will fail . . . ."). Accordingly, his ineffective assistance of counsel claim lacks merit.

*Judgment affirmed. All the Justices concur.*