314 Ga. 883
FINAL COPY

S22A0620.  SIMMONS v. THE STATE.

MCMILLIAN, Justice.

After a jury trial in 2017, Troy Simmons was convicted of felony murder and other crimes arising out of the shooting death of Wendell Lee and the aggravated assault of April Tongol.[1] On appeal,

_____

[1] The crimes occurred on December 23, 2013, and in May 2016, a Wayne County grand jury indicted Simmons for conspiracy to commit aggravated assault (Count 1), conspiracy to commit kidnapping (Count 2), conspiracy to commit false imprisonment (Count 3), aggravated assault of Lee with a deadly weapon (Count 4), aggravated assault of Tongol with a deadly weapon (Count 5), armed robbery (Count 6), felony murder of Lee while in the commission of conspiracy to commit aggravated assault (Count 7), felony murder of Lee while in the commission of conspiracy to commit kidnapping (Count 8), felony murder of Lee while in the commission of conspiracy to commit false imprisonment (Count 9), felony murder of Lee while in the commission of aggravated assault (Count 10), and two violations of the Georgia Street Gang Terrorism and Prevention Act, OCGA § 16-15-4 (a) and (d) (Counts 11 and 12).
At a trial conducted from January 24 through January 27, 2017, a jury found Simmons guilty of Counts 1, 4, 5, 7, 10, 11, and 12 and not guilty of the remaining counts. On January 27, 2017, the trial court sentenced Simmons to life in prison without the possibility of parole for felony murder while in the commission of aggravated assault (Count 10), 20 years in prison for the aggravated assault of Tongol (Count 5), 15 years in prison for one count of violation of the Georgia Street Gang Terrorism and Prevention Act (Count 11), and ten years in prison for the other count of violation of the Georgia Street Gang Terrorism and Prevention Act (Count 12), with each sentence to run

Simmons claims that: (1) the evidence was insufficient to sustain his convictions; (2) the trial court erred in failing to instruct the jury completely on corroboration for confessions as required by OCGA § 24-8-823; (3) the trial court erred in instructing the jury as to Simmons's flight; and (4) trial counsel rendered constitutionally ineffective assistance. Because Simmons has not shown reversible error, we affirm his convictions.

The evidence presented at trial showed that both Lee and Simmons were members of the "Bloods"[2] gang and involved in trafficking methamphetamine.[3] On December 23, 2013, Lee was

---

consecutively. The trial court purported to merge Counts 1, 4, and 7 with Count 10 (felony murder predicated on aggravated assault), although Count 7 (felony murder while in the commission of conspiracy to commit aggravated assault) was actually vacated by operation of law. See *Noel v. State*, 297 Ga. 698, 700 (2) (777 SE2d 449) (2015) (explaining that a "defendant found guilty of the felony murder of the same victim through the commission of more than one felony may only be sentenced on one felony murder charge, and the remaining felony murder charges stand vacated by operation of law").

Simmons filed a timely motion for new trial on February 1, 2017, which was amended through new counsel on February 15, 2021. After a hearing, the trial court denied the motion as amended on December 13, 2021. Simmons filed a timely notice of appeal on January 3, 2022; the case was docketed to the April 2022 term of this Court and submitted for a decision on the briefs.

[2] Simmons uses both "Blood" and "Bloods" to describe the gang he is in.

[3] Simmons admitted to and was consistently open about his membership in the "Bloods" gang. At trial, Luis Bowden, Lee's brother, testified that Lee

driving with his girlfriend, Tongol, to Wayne County to drop off his children at their mother's home. Tongol testified that after dropping off the children, Lee said he had to make a stop and was on the phone with another person who gave him directions to an abandoned house. When Lee and Tongol arrived, two armed men approached either side of the car "asking for money." Tongol said her purse was "snatched" from her after she got out of the car. Lee ran in one direction, and the two men followed him. Tongol ran in the opposite direction until she found people and asked to use their phone to call 911.[4] Tongol told the 911 operator that the men were armed; that she heard gunshots; and that Lee was likely shot, as she believed Lee to be unarmed.

Wayne County dispatch received a call at 11:49 p.m. on December 23, 2013, and officers responded to an area known as "the

_____

and Simmons were members of the "Bloods" gang and that the three of them had trafficked methamphetamine in Jesup. Also, a criminal street gang expert testified that based on the evidence, he considered Simmons to be a member of the "Bloods" gang and considered the activities in this case to be consistent with criminal street gang activity.

[4] Audio of Tongol's 911 call was admitted into evidence and played for the jury.

Hill." One investigator made contact with Tongol and then at 11:53 p.m. arrived at the abandoned house where Tongol told him she had left her car. There, the investigator found Lee unresponsive. The responding paramedic testified that Lee showed no signs of life. A Georgia Bureau of Investigation ("GBI") forensic pathologist performed Lee's autopsy and testified that there were five bullet wounds in Lee's body and that the cause of death was multiple gunshot wounds.

A GBI special agent who responded to the crime scene around 1:00 a.m. on December 24 testified at trial that Lee's body was located on the ground behind the house. The special agent also testified that he observed items that the coroner removed from Lee's pockets, including a bag of green leafy material consistent with marijuana, a bag of white powder consistent with cocaine, and about $2,930 in cash. Crime scene photos were admitted into evidence, including photos of Tongol's car, her purse and its contents on the ground, and an iPhone found near Lee's body. A semi-automatic .40-caliber pistol was found in the car's glove box. A GBI crime lab

4

examiner testified that the bullet recovered from Lee's body was a .30-caliber metal-jacketed bullet, consistent with being fired from a .38 Special or .357 Magnum revolver or pistol, but not consistent with being fired from a .40-caliber semi-automatic weapon.

GBI Investigator Lawrence Kelly was also involved in the investigation into Lee's death. During that investigation, Investigator Kelly talked to Lee's brother, Luis Bowden, who said that he was involved in drug distribution in Wayne County with both Simmons and Lee. Investigator Kelly then turned his investigation to and began communicating with Simmons. In January 2014, Investigator Kelly tried to arrest Simmons, but Simmons fled from his parole officer who was attempting to execute the arrest warrant. Eventually, Simmons was located in Virginia, where Investigator Kelly interviewed him on March 1, 2014. This interview lasted over five hours and the audio was played for the jury at trial almost in its entirety.[5]

---

[5] Investigator Kelly advised Simmons of his rights under *Miranda*, and Simmons signed a waiver of those rights before beginning the interview. See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

In his recorded interview, Simmons said that he was given instructions from a higher-ranking Bloods gang member known as "Bishop," who was involved with a Mexican drug cartel.[6] Bishop instructed Simmons to contact Lee because Lee owed $41,000 in relation to the methamphetamine trafficking. Simmons admitted to being at the crime scene, saying that he traveled alone to meet Lee in Jesup while Dominique Brown, Simmons's brother, and Gabe Fraizer drove separately to the same location. At the crime scene, Simmons instructed Brown and Fraizer to "dog pil[e]" or beat up Lee and then put Lee on the phone with Bishop. Simmons was supposed to take Lee to Atlanta to face members of a Mexican cartel who provided the methamphetamine that Lee was selling and to whom Lee owed the money. According to Simmons, he instructed Brown and Fraizer not to cause permanent physical damage and not to kill Lee. Simmons also said that if he had known Fraizer and Brown were going to shoot Lee, he would have stopped it. Simmons further

---

[6] Bowden also testified that Bishop was a member of the "Bloods" gang, was involved in methamphetamine trafficking, and was incarcerated at the time of the shooting.

admitted that, after Brown shot Lee, Simmons disposed of the firearm by giving it to someone behind a gas station near Atlanta.

Other evidence also supported Simmons's statement that he had been at the crime scene. Investigator Kelly testified that a cell phone from Tongol's purse was dumped outside of her car. The cell phone's number matched the phone number that family members said belonged to Lee; investigators were unable to determine the cell phone owner for the last call made on the phone. Simmons told Investigator Kelly during his interview that on December 23, he was at "the Beehive" in Liberty County — a gathering place for "Bloods" members. Then, Simmons drove to his apartment in Wayne County before driving to "the Hill," where Lee was shot. Investigator Kelly retrieved records for cell phones belonging to Simmons and Lee, as well as from the unknown number from Lee's recent calls. Then, he used the times, dates, and cell phone tower locations of each device to create a map of the cell phones' locations on the night of the shooting. Simmons's location, based on the cell phone records, was consistent with Simmons's interview statements. Additionally, the

unknown number recovered from Lee's cell phone was in the area of the Beehive at the same time as Simmons's device and then was in Wayne County around the same time as Simmons's device. Lee's phone and Simmons's phone were shown to be in the area where Lee was killed around the same time. Simmons testified that gang members often share or exchange phones and frequently change phone numbers.

Tongol testified that she had never met Simmons before. She further testified that the person who approached the passenger side of the car, where she sat on the night of the shooting, was masked, and that she did not "see anybody directly" that night. When asked if it was Simmons who had a gun on her, she responded that she did not think Simmons was on her side of the car but that, at the time of the shooting, she suspected Simmons to be the person on the driver's side of the car. However, Tongol did not give an explanation as to why she thought that.

Simmons testified at trial in his own defense and stated that he lied during his interview with Investigator Kelly and that, when

8

he asked to call his wife during the interview, he actually called another member of the "Brims" (a subset of the "Bloods") known as "Tee Tee" and was set up on a three-way call with Steven Cortez. Simmons was following gang protocol when he called Cortez, who ranked above Bishop in the "Bloods" gang hierarchy. Simmons testified that, after the phone call with Cortez, he lied to Investigator Kelly about being at the scene when Lee was killed, about giving away the gun, and about the whole story he told law enforcement during his interview. He said that he was supposed to be the "fall guy" because his "name was already out there," given that Lee's family had posted on Facebook the morning after the shooting that Simmons killed Lee. He was also supposed to take his brother, Brown, down with him.

Simmons testified that, unlike what he said in his interview with Investigator Kelly, he was not present when Lee was shot and was actually at the "Beehive" all night. Simmons also claimed at trial that, on the night of the shooting, Lee was supposed to bring

Simmons marijuana, but Lee was not answering his phone.[7] Simmons testified that Fraizer was notified that Lee was on the way to Wayne County, and Fraizer, Brown, Cortez, and others left to go meet with Lee. Simmons claimed that Brown and Fraizer were present at the shooting, but could not say who the shooter was because he was not there. Simmons said that he found out about the shooting later that night. Fraizer, who was not on trial in this case, was called by the defense as a witness but invoked his Fifth Amendment right against self-incrimination and did not testify.

1. Simmons asserts that the evidence was insufficient to sustain his convictions as a matter of constitutional due process. In reviewing sufficiency, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

---

[7] Bowden testified at trial that in December 2013, he talked to Simmons who told him he would be meeting with Lee when he was in Wayne County. Bowden further testified that when he called Simmons the morning after Lee was shot, Simmons told Bowden that he did not meet up with Lee the previous night.

(III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (emphasis in original). In doing so, "we construe the evidence presented in the light most favorable to the verdict, and neither reweigh it nor determine witness credibility." *Terrell v. State*, 300 Ga. 81, 84 (1) (793 SE2d 411) (2016).

Simmons was convicted of and sentenced on the following: felony murder while in the commission of aggravated assault,[8] aggravated assault of Tongol by pointing a handgun at her, and two violations of the Street Gang Terrorism and Prevention Act, OCGA § 16-15-4 (a) and (d).[9]

---

[8] OCGA § 16-5-1 (c) provides that a person commits "the offense of murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-21 (a) (2), in turn, sets out that "[a] person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon . . . ."

[9] OCGA § 16-15-4 (a) provides that "[i]t shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." Count 11 of the indictment charged Simmons with criminal street gang activity by conspiring to commit a criminal offense that involves violence by committing a simple battery on Lee. See OCGA § 16-15-3 (1) (J) (defining "criminal gang activity" as including the "conspiracy to commit . . . [a]ny criminal offense in the State of Georgia . . . that involves violence . . . whether designated as a felony or not, and regardless of the maximum sentence that could be imposed or actually was imposed").

OCGA § 16-15-4 (d) provides that "[i]t shall be unlawful for any person

Here, Simmons admitted to and testified about being a member of the "Bloods" gang, and Bowden testified that he, Lee, and Simmons trafficked methamphetamine. Although he later recanted, Simmons further admitted in a statement to Investigator Kelly that he ordered gang members to beat up Lee, he was present at the scene when Lee was shot and Tongol was assaulted, and he disposed of the firearm used in the shooting. Further, a mapping of pertinent cell phone records corroborated Simmons's admissions, and Tongol placed Simmons at the scene of the shooting. This evidence was more than sufficient for a rational jury to determine that Simmons was "guilty beyond a reasonable doubt of the crimes of which he was convicted either as a direct participant or as a party to the crimes charged pursuant to OCGA § 16-2-20 (a)."[10] *Terrell*, 300 Ga. at 84

---

who occupies a position of organizer, supervisory position, or any other position of management or leadership with regard to a criminal street gang to engage in, directly or indirectly, or conspire to engage in criminal gang activity." Count 12 of the indictment charged Simmons with being in a leadership position with the "Bloods," a criminal street gang, and conspiring to commit a criminal offense that involves violence by committing a simple battery on Lee.

[10] OCGA § 16-2-20 (a) provides: "Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."

(1). See also *Thomas v. State*, 311 Ga. 573, 575 (1) (858 SE2d 504) (2021) ("As long as there is some competent evidence, even if contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.") (citation and punctuation omitted); *Cash v. State*, 297 Ga. 859, 864 (3) (778 SE2d 785) (2015) ("A defendant who lacks knowledge that his co-defendant possessed the gun that was used to commit an aggravated assault may nevertheless be a party to the aggravated assault."). As such, this enumeration fails.

2. Simmons next asserts that the trial court committed two errors in its instructions to the jury by failing to completely instruct the jury that a confession must be corroborated as required by OCGA § 24-8-823 and in instructing the jury on Simmons's flight.

Because Simmons did not preserve either claim for ordinary appellate review by objecting at trial, we review only for plain error. See *Rawls v. State*, 310 Ga. 209, 218 (4) (850 SE2d 90) (2020). The four prongs of the plain error analysis are set out in *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011), as follows:

First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citation and punctuation omitted; emphasis in original.) "The Court need not analyze all of the elements of the plain error test when the appellant fails to establish one of them." *Hill v. State*, 310 Ga. 180, 194 (11) (a) (850 SE2d 110) (2020).

(a) Simmons first asserts that the trial court failed to instruct the jury completely on the principles codified in OCGA § 24-8-823 by not telling the jury that corroboration of the statements was "absolutely required" for conviction. We disagree.

OCGA § 24-8-823 provides that all admissions "shall be scanned with care," and a "confession alone, uncorroborated by any

14

other evidence, shall not justify a conviction." Simmons argues that the trial court did not adequately instruct the jury as to these principles and did not make it clear enough that a confession must be corroborated.

Simmons cannot show error, much less plain error. The trial court advised the jury that "[a] defendant's out-of-court statement that is not supported by any other evidence is not sufficient to justify a conviction, even if you believe the unsupported statement" and that "[i]f you find that there was a statement made by the defendant that was supported by other evidence, the degree of proof necessary to convict is that you be satisfied of the guilt of the defendant beyond any reasonable doubt." This instruction came directly from Georgia's pattern jury instructions in effect at the time of Simmons's trial. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (2017), § 1.32.70. Because Simmons has not pointed to any authority that these instructions did not adequately cover the principles that Simmons claims the trial court should have charged even if the corroboration requirement of OCGA § 24-8-823 were to apply to

15

Simmons's statements,[11] Simmons has failed to show that the trial court committed error that is clear or obvious under current law. See *Ash v. State*, 312 Ga. 771, 794-95 (5) (a) (865 SE2d 150) (2021) (Trial court's failure to give portion of pattern charge on confession-corroboration was not plain error because Ash "has pointed to no precedent holding that the omission of this sentence from the pattern instruction constitutes error under these circumstances.").

Moreover, even assuming error in failing to provide more complete instructions on confession-corroboration, there was ample evidence at trial to corroborate Simmons's statements, including the cell phone records and testimony from Tongol, Bowden, and Investigator Kelly such that it is unlikely that the failure to instruct more on confession-corroboration affected the outcome of the proceedings. Thus, we conclude that there was no plain error because Simmons has failed to show clear and obvious error and that any purported error affected his substantial rights. See *Hooper v.*

---

[11] We do not express any opinion on whether Simmons's statements are considered confessions, which must be corroborated under OCGA § 24-8-823, rather than admissions.

*State*, 313 Ga. 451, 457 (2) (870 SE2d 391) (2022) (no plain error where appellant failed to demonstrate that trial court's alleged error in giving "incomplete" confession-corroboration jury charge likely affected outcome of the trial in light of "ample corroborating evidence" of his statements); *English v. State*, 300 Ga. 471, 474 (2) (796 SE2d 258) (2017) (no plain error where corroboration was not required for admissions and even if the statements were confessions, appellant failed to show that the failure to instruct on corroboration likely affected the outcome of the proceedings because there was ample evidence to corroborate the statements).

(b)　Simmons next asserts that the trial court plainly erred in instructing the jury that evidence of flight had been introduced and that the evidence could only be considered if the jury found it more likely than not that Simmons fled to avoid arrest. See *Renner v. State*, 260 Ga. 515, 518 (3) (b) (397 SE2d 683) (1990) (It is "error for a trial court in a criminal case to charge the jury on flight.").

We agree that this instruction was a clear and obvious error. See *Rawls*, 310 Ga. at 219 (4) (a) ("Accordingly, the trial court

17

committed a clear and obvious error by instructing the jury on flight in disregard of *Renner*."). However, Simmons has not shown how the instruction "affected his substantial rights, meaning that it probably affected the outcome of the trial." Id. at 213 (3). There was ample evidence other than evidence of Simmons's flight to establish his guilt, including Simmons's own admissions and contradicting testimony, testimony from Tongol, Bowden, Investigator Kelly, and a criminal street gang expert, and cell phone records mapping out Simmons's phone location on the night of the shooting. Therefore, "[t]here is no reason to believe that this particular instruction caused the jury to give undue weight to the flight evidence, particularly given the other strong evidence against Appellant." Id. at 219 (4) (a). For these reasons, this enumeration fails.

3. Simmons also asserts that his trial counsel rendered ineffective assistance on three grounds. To prevail on these claims, Simmons must prove both that his counsel's performance was deficient and that he was prejudiced by the deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052,

18

80 LE2d 674) (1984). Deficient performance by trial counsel requires a showing that "counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms." *Neal v. State*, 313 Ga. 746, 751 (3) (873 SE2d 209) (2022). To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B).

(a) Simmons asserts that his trial counsel rendered ineffective assistance in failing to object to the jury instruction on confession-corroboration.

At the motion for new trial hearing, Simmons's trial counsel testified that she believed the pattern instruction, as given, was required and that it was in Simmons's best interest for the jury to hear that his admissions alone could not be used to convict him. Moreover, as discussed in Division 2 (a) above, the trial court did not

19

err in giving this jury instruction. Thus, trial counsel was not deficient in failing to object. See *Durrence v. State*, 287 Ga. 213, 218 (2) (a) (695 SE2d 227) (2010) ("Counsel's failure to make a meritless objection does not constitute deficient performance.").

(b) Simmons further asserts that trial counsel rendered ineffective assistance by failing to object to the jury charge regarding Simmons's flight.

Although we explained in Division 2 (b) that the trial court erred in instructing the jury on Simmons's flight, we also concluded that Simmons failed to show how this instruction "affected the outcome of the trial court proceedings." (Citation and punctuation omitted.) *Kelly*, 290 Ga. at 33 (2) (a). Accordingly, this enumeration also fails. See *State v. Newman*, 305 Ga. 792, 798 (2) (b) (827 SE2d 678) (2019) (explaining that where "no harm [has come] from the trial court's failure to give a [specific charge], trial counsel could not have been ineffective for failing to request such a charge"); *Hampton v. State*, 302 Ga. 166, 168-69 (2) (805 SE2d 902) (2017) (equating the prejudice prong of the plain error test with the prejudice prong for

20

an ineffective assistance claim).

(c) Simmons next contends that trial counsel rendered ineffective assistance in failing to adequately investigate his case.

At the motion for new trial hearing, Simmons claimed that he gave counsel names of potential witnesses and that trial counsel did not pursue those leads. However, trial counsel also testified at the hearing and explained that Simmons did not provide contact information for these potential witnesses, which Simmons admitted, arguing that it was the investigator's job to locate these people and not his. Trial counsel further testified that the potential witnesses were mostly gang members who lived a "transient lifestyle" and that she received threatening phone calls from some of these people, which the GBI took seriously. The trial court, as finder of fact in a motion for new trial hearing, was entitled to credit trial counsel's testimony as to her efforts to investigate Simmons's case. See *Gray v. State*, 309 Ga. 850, 855 (2) (b) (848 SE2d 870) (2020) ("[T]he credibility of the witnesses at the motion for new trial hearing was for the trial court to determine[.]"). Also, Simmons failed to make a

21

proffer as to what an additional investigation would have uncovered or what the testimony of the uncalled witnesses would have been and therefore has failed to establish that the trial outcome would have likely been different with the additional information. See *Barge v. State*, 294 Ga. 567, 569 (2) (755 SE2d 166) (2014) (explaining that appellant cannot prevail on the prejudice prong of his ineffective assistance claim where he "did not proffer any uncalled witness . . . or otherwise proffer a legally recognized substitute for such testimony" at the motion for new trial hearing). Therefore, to the extent that trial counsel was deficient, Simmons has failed to show prejudice.

4. Finally, Simmons argues that the count of aggravated assault of Tongol should have been factually merged into the count for felony murder of Lee.[12]

---

[12] Simmons raised this and other additional arguments in his reply brief: that his sentence was overly burdensome, that trial counsel rendered ineffective assistance in failing to object to the stacking of charges, and that there was a lack of accomplice corroboration. Although we consider Simmons's claim of merger error, these other issues have been waived because they were not timely raised in his initial appellate brief. See *Williams v. State*, 307 Ga.

As recounted in footnote 1, Simmons was convicted of a number of charges, but several of the charges merged for sentencing purposes or were vacated by operation of law. The trial court properly merged the counts alleging conspiracy to commit aggravated assault of Lee (Count 1) and aggravated assault of Lee (Count 4) into the felony murder conviction predicated on aggravated assault (Count 10). See OCGA § 16-4-8.1 (A person "may not be convicted of both conspiracy to commit a crime and the completed crime."); *Hinton v. State*, 304 Ga. 605, 609 (3) (820 SE2d 712) (2018) (determining that the trial court properly merged the underlying aggravated assault count into the felony murder conviction predicated on aggravated assault). And the other felony murder count (Count 7) was vacated by operation of law. See *Noel v.*

689, 689 n.2 (838 SE2d 314) (2020) ("[A]n appellant who raises an argument for the first time in a reply brief is not entitled to have that argument considered.") (citation and punctuation omitted); *Nazario v. State*, 293 Ga. 480, 485 (2) (b) (745 SE2d 109) (2013) ("We held that this customary waiver rule does not apply to merger claims, because merger as a matter of law or fact renders the merged conviction void and the resulting sentence illegal and requires the reviewing court to vacate the conviction and sentence even if the error was not raised in the trial court and indeed even if it is not enumerated as error on appeal.").

*State*, 297 Ga. 698, 700 (2) (777 SE2d 449) (2015) (defendant may only be sentenced on one felony murder charge when found guilty of the felony murder of the same victim through the commission of more than one felony, and the remaining felony murder charges are vacated by operation of law).

Therefore, the trial court did not err in not merging the aggravated assault of Tongol (Count 5), a separate victim, into the conviction for the felony murder of Lee. See *Hulett v. State*, 296 Ga. 49, 56 (2) (c) (766 SE2d 1) (2014) ("Where two victims are robbed, the defendant may be charged with, convicted of, and sentenced for the robbery of each victim."); *Henderson v. State*, 285 Ga. 240, 244 (3) (675 SE2d 28) (2009) ("When the underlying felony is committed upon one victim and the felony murder charged in another count in the same indictment is committed upon another victim, the underlying felony does not merge with the felony murder conviction" and determining that trial court did not err in entering separate convictions and sentences where defendant was charged with felony murder of one victim based on armed robbery and armed robberies

24

of other victims) (citation and punctuation omitted); *George v. State,* 276 Ga. 564, 565 (2) (580 SE2d 238) (2003) (malice murder and aggravated assault counts do not merge where murder was committed upon one victim and the aggravated assault was committed upon a different victim).

*Judgment affirmed. All the Justices concur.*

Decided October 25, 2022.

Murder. Wayne Superior Court. Before Judge Lane.

*Robert L. Persse; Brownstone, P.A., Robert L. Sirianni, Jr., George W. Thomas*, for appellant.

*Keith Higgins, District Attorney, Robert German, Jr., Benjamin E. Gephardt, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Emily R. Polk, Assistant Attorney General*, for appellee.