NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 25, 2022

S22A0521.  REESE v. THE STATE.

BOGGS, Chief Justice.

Appellant Jacarey Reese challenges his 2019 conviction for felony murder in connection with the shooting death of Stacy Devero.[1] Appellant's first trial ended with a hung jury. At his second trial, the defense argued both that Appellant did not shoot Devero and that, even if he did, he was legally justified in doing so.

---

[1] Devero was killed on October 8, 2018. On December 18, 2018, a Laurens County grand jury indicted Appellant for malice murder, two counts of felony murder, and two counts of aggravated assault with a deadly weapon. Appellant's first trial took place in October 2019 and ended with a hung jury. At Appellant's second trial in December 2019, the jury acquitted him of malice murder but found him guilty of the remaining charges. The trial court sentenced him to serve life in prison for felony murder based on aggravated assault for shooting Devero. The other felony murder count was vacated by operation of law, and the aggravated assault verdicts merged for sentencing purposes. Appellant filed a timely motion for new trial, which he amended with new counsel on May 24, 2021. The trial court denied the motion on November 16, 2021. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the April 2022 term and submitted for a decision on the briefs.

Appellant contends that the trial court committed reversible error when it denied his request to give a modified version of the former pattern jury instruction on affirmative defenses in light of this Court's then-recent decision in *McClure v. State*, 306 Ga. 856 (834 SE2d 96) (2019), and when it overruled his objections to the prosecutor's repeated arguments in closing that Appellant was legally precluded from claiming justification because he never admitted that he shot Devero. Appellant also contends that the trial court committed plain error in responding to a jury note showing that the jury was swayed by the prosecutor's improper arguments and therefore misunderstood the law of justification.

As explained below, under the facts of this case, the trial court erred in denying Appellant's request to give a modified version of the former pattern jury instruction on affirmative defenses in light of *McClure*. As a result of that initial error, the trial court overruled Appellant's objections to the prosecutor's repeated misstatements of the law of justification during closing arguments, which the note sent out by the jury during deliberations showed had misled the

jury. Moreover, the court's response to the jury's note did nothing to correct the jury's misunderstanding of the law and indeed may have worsened it. Accordingly, we cannot say that the court's instructional error was harmless, and we therefore reverse Appellant's conviction and sentence for felony murder. However, we also conclude that the evidence presented at trial was legally sufficient to support Appellant's conviction, so the State may retry him if it so chooses.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On October 8, 2018, Appellant arranged through his friend Jamil Thompkins to buy two ounces of marijuana from Devero for about $450. Shortly before 6:00 p.m., DaQuavius Stanley, Appellant's half-brother, drove him to Thompkins' apartment complex, where Appellant got out at Thompkins' building and walked around to the back. Stanley drove on to Building D and backed into a spot at the far end of a row of parking spaces located directly in front of that building. A

surveillance camera trained on Building D and the parking area out front captured video that was later played for the jury.

A few minutes after Stanley arrived and parked at the far end of the row of parking spaces, Jonathan Linder arrived in a Toyota sedan with Devero in the front passenger seat, pulled into the first spot in the row of parking spaces, and parked. Linder and Devero got out, walked to the rear of the Toyota, and leaned on either side of the trunk. A minute later, Appellant, who was carrying a bright blue book bag, walked up to Linder, and Devero directed Appellant to go around the Toyota and stand by the front passenger-side door while they waited for Thompkins. A few minutes later, Thompkins, who was carrying a black book bag, walked up to Linder. Appellant then opened the door of the Toyota and started to get into the front seat but stopped when Thompkins' cell phone rang and Thompkins answered the call. Thompkins stood there talking on his cell phone for the next several minutes.

A few minutes into the call, Devero said that they did not need to wait for Thompkins, and Appellant took off his book bag and sat

4

in the Toyota, leaving the door open. Linder walked to the front driver-side door, which also was open, stuck his head inside, and spoke to Appellant for about ten seconds before walking back towards the trunk. While Linder was talking to Appellant, Thompkins finished his call, took off his book bag, and reached inside it, leaving his hand there during what happened next.

A few seconds after Linder finished talking to Appellant, Appellant called to Devero, who had been leaning heavily on the trunk of the Toyota, and Devero walked up to the open front passenger-side door by Appellant. Devero put his right hand on the edge of the door, leaned in slightly for a couple of seconds, leaned back for a couple of seconds, and leaned in again for a couple seconds more. Suddenly, Devero stepped back quickly, reaching with his right hand for the nine-millimeter pistol on his right hip. As Devero started to lift his gun, Appellant bolted out of the car with a gun in his left hand and shot Devero once in the face. The bullet struck Devero on the right side of his chin, passed in a downward direction through his neck and his right carotid artery, and lodged under the

5

skin behind his right shoulder. Devero's right arm went limp, and he fell to the ground on top of his gun as Appellant stumbled past him towards Stanley's car. Linder ran to a grassy area behind the Toyota, and Thompkins slowly backed away.

It took Appellant several seconds to reach Stanley's car, and he crouched down on the other side of it. Devero managed to get up, use his left hand to pick up his gun, and toss it clumsily to the grassy area where Linder had run. Stanley then sped off towards the rear of the apartment complex with Appellant in his car as Devero briefly walked towards Linder and Linder picked up Devero's gun. After a few seconds, Linder and Devero turned around, ran back to the Toyota, got in, and drove out of the apartment complex. Once Stanley saw that the Toyota had left, he turned around, drove back past Building D, and exited the apartment complex headed in the opposite direction from the Toyota.

Linder drove Devero to Fairview Park Hospital, where Devero died. At approximately 6:15 p.m., Detective Allen Harris of the Dublin Police Department, who was at the hospital to investigate

another case, was informed that a man with a gunshot wound had just arrived. Detective Harris spoke with Linder, who told him where the shooting took place and said that Devero was shot during a drug deal that Thompkins set up. Detective Harris briefed Lieutenant Stacy Sapp on the situation, and Lieutenant Sapp went to Thompkins' apartment complex with other officers and eventually arrested Thompkins. Detective Harris also went to the apartment complex but stayed only about ten minutes before leaving to go to the police station to formally interview Linder. Detective Harris showed Linder an array containing photographs of Appellant and Thompkins, but Linder did not identify either of them. Linder later fled the state and could not be located to testify at either of Appellant's trials.

Detective Harris interviewed Thompkins later that evening at the police station. At the apartment complex, Sergeant Lee Washburn recovered a spent nine-millimeter shell casing from the space where the Toyota had been parked. The Toyota was towed from the hospital to the police station, where Officer Patti Fountain

7

found Appellant's blood-soaked open blue book bag in the floorboard of the front passenger seat and Devero's blood-covered nine-millimeter pistol in the floorboard of the driver's seat.

Sometime before 6:00 a.m. on the day after the shooting, Detective Harris reviewed surveillance video from the apartment complex, which was later played for the jury at each of Appellant's trials. Detective Harris knew Appellant and Thompkins from the community and recognized them on the video. Lieutenant Sapp also reviewed the video and was able to locate Stanley at his job based on the car that Stanley was driving in the video. Stanley was taken into custody shortly after 6:00 a.m. and interviewed by Detective Harris before being released.

At around 7:30 a.m., the police arrested Appellant at work and took him to the police station, where he waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 444 (86 SCt 1602, 16 LE2d 694) (1966), and was interviewed for approximately 15 minutes. The interview was audio and video recorded and later played for the jury at each of Appellant's trials. Detective Harris told Appellant at the

outset that he needed Appellant to be honest about everything; that if he lied, it would just get him "deeper into this"; that Detective Harris already knew that Appellant "was there"; and that he just needed to know what Appellant's involvement was, starting from the previous afternoon.

Appellant provided a thorough account of his whereabouts and actions on the afternoon and evening of the previous day, including a detailed timeline from 2:30 p.m. to 9:50 p.m., but left out his trip to Thompkins' apartment complex and the shooting.[2] Detective Harris asked, "Is that it?" and Appellant replied, "Yeah." Detective Harris told Appellant that he did not tell the truth and that he had

---

[2] According to Appellant, he got off work at 2:30 p.m., went home, and took a shower. At around 3:30 or 4:00 p.m., his older sister drove him and his twin brother to his grandfather's house, where he and his brother stayed while his sister took his grandfather shopping. When they returned from shopping, his sister went home, but he and his brother decided to stay for a little while longer. The brother went to his girlfriend's house, and Appellant "stayed on the south side for a little while" – which is not the part of town where Thompkins' apartment complex was – and then "went and got a haircut at about 7:30 [p.m.]" at his cousin's house, which also is on the south side. Appellant remembered that he was getting his haircut at 7:30 p.m., because his mother called him as she was about to get off work, and she gets off work at 7:30 p.m. At "about 8:00, 8:00 to 8:30 [p.m.]," he went to his "other brother" Keondrick's house, where they "were chilling until about 9:50 [p.m.]," when Appellant called his sister, who came and got him and drove him home.

Appellant "on video, plain as day, with the book bag on" at Thompkins' apartment complex and asked Appellant to tell him the truth. Appellant said, "That's the truth. I promise you, that's the truth."

Detective Harris then said, "It's not. I'm telling you, I have you on video, with your brother, with a gun in your hand. That video is not going to lie. It shows the car you were in, your brother's car." Detective Harris said that he needed to know what happened the day before and what Appellant's part was in it, and Appellant nodded towards the notes that Detective Harris was taking and said, "That's the truth right there." Detective Harris replied, "No, it's not. I'm telling you, I have you on video. Are you hearing me?" Appellant said, "Yeah," and Detective Harris repeated, "I have you on video" at Thompkins' apartment complex "with a gun in your hand during a drug transaction. The result is we have one dead guy. Okay? So this is not true," pointing to his notes.

Appellant said, "I know it's true. I swear. You can call my brother." Detective Harris replied, "I don't have to. I have the video.

The person you was with, that you got out of the car with, has already told us everything, and we have the video." Detective Harris continued, "So I'm telling you, unless you want another charge for giving me false information obstruction . . . ." Appellant interrupted and said, "I'm going to beat it. And that's the truth, I promise you, that's the truth right there."

Lieutenant Sapp then entered the interview room and, after listening for less than half a minute, explained to Appellant at length the course of the investigation thus far, what the surveillance video showed, what physical evidence had been recovered, and what witnesses had told the police. Lieutenant Sapp then said, "I can't tell if he shot at you first – because we've got a bullet casing – or you shot at him first." Detective Harris asked Appellant, "So was it self-defense?" and Appellant replied, "Self-defense," indicating that it was self-defense. Lieutenant Sapp then asked, "Did you even pull your trigger?" Appellant leaned over, hung his head, and said, "It was just crazy. It was just crazy." Lieutenant Sapp got up and walked out of the interview room.

Detective Harris asked Appellant, "What did he say to you?" and then described, while writing on a piece of paper, where Devero, Linder, Thompkins, and Appellant were just before the shooting. Detective Harris continued, "You sit down in the car. He turns. He walks over . . . . It's something that you say to him or he says to you, and from there everything went south. . . . What went wrong?" Appellant mumbled, "I don't know. I mean, you already know. You already know what's going on now, so I'm . . . ," before trailing off. Detective Harris then said, "I mean, did he say something to you? Did he – I mean, something had to happen." Appellant replied, "It just went crazy, it just, um, in one split second." Detective Harris asked, "You saw him pull a gun? He saw you pull a gun?" and Appellant replied, "Yeah, he pulled it." Detective Harris stated, "You're going to have to tell me a little bit more for it to show self-defense." Appellant then said, "I wanted to wait until I get a lawyer. I'm going to need one," and Detective Harris ended the interview.

After Appellant's first trial, which ended with a hung jury, but before his second trial, a GBI firearm examiner compared the nine-

millimeter shell casing recovered from the space where the Toyota had been parked to Devero's nine-millimeter pistol recovered from the floorboard of the driver's seat of the Toyota. At Appellant's second trial, the firearm examiner testified that the ammunition stamp on the shell casing recovered from the apartment complex did not match the ammunition stamp on the seven unfired rounds found in the magazine of Devero's gun; that she fired three test rounds from Devero's gun; that the shell casing recovered from the apartment complex lacked distinctive microscopic markings that she observed on all three test-fired shell casings; and that in her expert opinion, the shell casing recovered from the apartment complex was not fired from Devero's gun.

Appellant elected to testify at his first trial but not at his second trial. At Appellant's second trial, the State introduced into evidence an audio recording of his testimony at his first trial, which was played for the jury with stipulated redactions. Appellant admitted that on the day of the shooting, he went to Thompkins' apartment complex to buy "a large amount of drugs," got Stanley to

13

drive him there, and brought a gun with him, although he claimed that the gun was a .40-caliber Smith and Wesson that he just "happened to have . . . on [him]" that day. Appellant further claimed that he had never met Devero or Linder but trusted them because Thompkins had done deals with them before and trusted them. Appellant said that he sat down in the front passenger seat of the Toyota, opened his book bag, and called Devero over. According to Appellant, "as soon as [Devero] came from the back he seen my book bag" and pulled his gun and pointed it at Appellant. Appellant said that when he saw Devero's gun, he thought that he was about to be robbed and that Devero was about to shoot him over a drug deal, so he "r[a]n beside the car," and that was "when the shot went off." Appellant claimed that he did not know if anyone had been shot, and he insisted that he did not shoot Devero, that he did not ever fire a shot, and that the only shot that was fired was not fired by him.

Appellant said that after the shooting, he and Stanley went to Stanley's house, because they "just wanted to kind of chill for a second" and "to kind of recap." According to Appellant, he then went

14

to his cousin's house to get a haircut. Appellant acknowledged that when Detective Harris interviewed him, he deliberately left out his "whereabouts from roughly 4:30 to 7:00 [p.m.]" and "fast[-]forwarded it to 7:30 [p.m.] when [he] was getting [his] hair cut." Appellant said that when Detective Harris was telling him that he needed "to be honest," it felt like "they [were] trying . . . [to] pin the murder on me." As for the gun that Appellant can be seen holding in the surveillance video, he claimed that he had it in the waistband of his basketball shorts, and when he got out of the car and started running, "I guess it was kind of slipping, so when I was stumbling," the gun slipped out the bottom of his shorts and he grabbed it. Appellant said that he did not pull out his gun when he was sitting in the Toyota.[3]

On cross-examination, Appellant acknowledged that he went to Thompkins' apartment complex to buy two ounces of marijuana from Devero for $450. Appellant claimed that he had the money in

---

[3] The surveillance video does not reveal what happened inside the Toyota. The recording captured some sounds, including the gunshot and a word or two here and there, but the audio is otherwise largely unintelligible.

his pocket but never took it out. He acknowledged that Devero did not have his gun out as he approached Appellant and that Devero did not pull his gun until he "got in front of [Appellant]," which is when he claimed he first saw Devero's gun. Appellant admitted that he grabbed his own gun and pulled it out as he lunged out of the car but said that he did so because he could feel his gun slipping. Appellant said that his gun was on his left side and that he used his left hand to pull it out, because he is left-handed. When asked how close the gunshot was, Appellant said, "It really felt like it was on my ear," because it was "so loud." Appellant added that he knew that he did not fire his gun, because every time he grabs his gun, he keeps his trigger finger on the side along the barrel as a safety measure.

Appellant acknowledged that it would be reasonable to think that he had his gun in his book bag; that once he sat down in the Toyota, he opened his book bag and pulled out his gun; and that the reason Devero can be seen on the surveillance video backing up quickly and starting to pull his own gun is because Devero had seen Appellant pull a gun out of his book bag. Appellant also conceded

16

that, given how close he was to Devero when the shot was fired and the fact that no one else was in close proximity to them, there were only two possibilities: either he shot Devero, or Devero shot himself. However, Appellant said that he had reason to conclude that Devero possibly could have shot himself, because the medical examiner who performed the autopsy on Devero said that was a possibility.[4]

The defense theory at the second trial was that the State failed to prove beyond a reasonable doubt that Appellant shot Devero (as opposed to Devero shooting himself), and that even if the State proved that Appellant shot Devero, the State failed to prove beyond a reasonable doubt that Appellant was not acting in self-defense. Appellant called four witnesses. Appellant's older sister, Keyona

---

[4] The medical examiner testified at Appellant's first trial but was on medical leave at the time of Appellant's second trial and unavailable to testify. At Appellant's second trial, the State introduced into evidence an audio recording of the medical examiner's prior testimony, which was played for the jury. On cross-examination, defense counsel asked whether, given the entry point of the bullet and the path it travelled through Devero's body, "it would be possible for [Devero] to have been holding the gun that shot the bullet into his chin?" The medical examiner replied, "That would be possible, yes." She was not asked whether it would have been possible for Devero to inflict the fatal wound if he were holding the gun in his right hand in the usual firing position.

Reese, testified that on the day of the shooting, she took Appellant to their grandfather's house in the afternoon and left him there, because Appellant said that Stanley was coming to pick him up. Appellant's mother, Ketika Williams, testified that on the day after the shooting, she asked Appellant if he knew anything about it, and he told her that he did not. Defense investigator Dru Watson testified about his efforts to locate Linder and his inability to do so. And Officer Amelia Johnston testified that she spoke with Linder at the hospital after the shooting; that Linder said that he drove Devero to the hospital but was not present during the shooting; that when she talked to Linder again, he described the shooter, said that the shooter ran off after the shooting, and told her where the shooting took place; that she assisted in securing the Toyota at the hospital; and that the Toyota was transported to the police station following proper procedures and protocol.

The jury was instructed, among other things, that "an affirmative defense is a defense that admits the doing of the act charged but seeks to justify, excuse, or mitigate it"; that "[o]nce an

18

affirmative defense is raised, the burden is on the State to disprove it beyond a reasonable doubt"; that "[t]he fact that a person's conduct is justified is a defense to prosecution . . . for any crime based on that conduct"; and that the defense of justification includes the use of force in self-defense. The jury also was instructed that "[a] person is not justified in using force if that person . . . is attempting to commit, or is committing, or is fleeing after the commission or attempted commission of a felony."

Appellant does not challenge the legal sufficiency of the evidence supporting his conviction for felony murder. Nevertheless, because we are reversing his conviction, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of due process to authorize a rational jury to find beyond a reasonable doubt that Appellant shot Devero, and not in self-defense, and that Appellant instead was guilty of felony murder. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Neal v. State*, 313 Ga.

19

746, 749 (873 SE2d 209) (2022) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)); *Anthony v. State*, 298 Ga. 827, 829 (785 SE2d 277) (2016) ("The jury is free to reject any evidence in support of a justification defense and to accept the evidence that the shooting was not done in self-defense.").

2. Appellant contends that the trial court erred in denying his request to give a modified version of the pattern jury instruction on affirmative defenses in light of this Court's then-recent decision in *McClure*. We review a claim that a trial court erred in refusing to instruct a jury on an applicable principle of law de novo. See *Walker v. State*, 311 Ga. 719, 722 (859 SE2d 25) (2021). See also *McClure*, 306 Ga. at 863 (explaining that to "authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge," and that "[w]hether the evidence presented is sufficient to authorize the giving of a charge is a question of law" that this Court reviews de novo (citations and punctuation omitted));

*Collier v. State*, 288 Ga. 756, 761, 763 (707 SE2d 102) (2011) (Nahmias, J., concurring specially) (noting that de novo review normally applies to properly preserved claims of instructional error). We hold that, given the evidence presented at Appellant's second trial, the trial court erred in refusing to give the modified version of the pattern jury instruction on affirmative defenses that Appellant requested.

On the fourth day of Appellant's second trial, Appellant gave the court a copy of this Court's decision in *McClure* and asked the court to give the jury a modified version of the pattern jury instruction on affirmative defenses that incorporated language from *McClure*. Appellant argued that, as this Court said in *McClure*, the phrase "admits the doing of the act charged," Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 3.00.00 (4th ed. 2007, updated January 2019), "can easily be misinterpreted." 306 Ga. at 865. Appellant asked the trial court to instruct the jury as follows instead:

21

> An affirmative defense is one in which the defendant argues that, even if the allegations of the indictment are true, there are circumstances that support a determination that he cannot or should not be held criminally liable.

This language was taken almost verbatim from our opinion in *McClure*.[5]

The State objected, arguing that the modified instruction was not appropriate, as there was no evidence that Appellant had admitted to the shooting. The State further argued that although a defendant need not *testify* in order to receive a self-defense instruction, there must be slight evidence from some source that the defendant *admitted* to the underlying act, and there was no such evidence here. Appellant responded that *McClure* did not require the defendant to admit anything, and that because he had two alternate theories of defense – i.e., that Devero shot himself and that

---

[5] There was only one small change: given that Appellant was charged by indictment and not by accusation, Appellant's requested instruction left out the words "or accusation" after the word "indictment." Cf. *McClure*, 306 Ga. at 857 ("[A]n affirmative defense is one in which the defendant argues that, even if the allegations of the indictment *or accusation* are true, there are circumstances that support a determination that he cannot or should not be held criminally liable." (emphasis added)).

Appellant shot Devero in self-defense – he was in the same position as the defendant in *McClure*. The trial court refused Appellant's request, stating, "I'm sticking with the pattern charge." Appellant renewed his objection to the use of the unaltered pattern jury instruction after the court charged the jury.

Although this Court said in *McClure* that the language "admits the doing of the act charged" in the former pattern instruction was a correct statement of the law as an abstract proposition, we also explained that this language can easily be misinterpreted, and that "wording more in line with our analysis herein would be advisable." Id. at 865. And we made clear that "[a] criminal defendant is not required to 'admit' anything, in the sense of acknowledging that any particular facts are true, in order to raise an affirmative defense." Id. at 857. Furthermore, we disapproved a long line of Court of Appeals decisions requiring a criminal defendant to admit the charged criminal act in order to get an affirmative defense instruction. See id. at 864 & n.17. Moreover, it is black-letter law that jury instructions must be adjusted to the evidence in the

23

particular case before the jury. See, e.g., *Morris v. State*, 308 Ga. 520, 529 (842 SE2d 45) (2020) ("'[A] jury instruction must be adjusted to the evidence and embody a correct, applicable, and complete statement of law.'" (alteration in original; citation omitted)).

Here, there was ample evidence to support the giving of an instruction on the affirmative defense of justification – far more than the slight evidence that is required to support the giving of a requested jury charge. See *McClure*, 306 Ga. at 863. However, the charge as given was not properly adjusted to the evidence. Although Appellant never "admitted" to firing his gun, the evidence could have supported a finding that he did so in self-defense, or at least that the State had not disproven that he did so beyond a reasonable doubt. As Appellant stated in his testimony at his first trial, which was admitted into evidence at his second trial, "the video speaks for itself." The video showed that Devero pulled his gun, that Appellant bolted out of the car, that for an instant they passed or clashed, and that a shot was fired. Appellant told the police that Devero pulled

24

his gun, and when Detective Harris asked, "So was it self-defense?" Appellant replied, "self-defense." Even putting aside Appellant's ambiguous response to Detective Harris' question about self-defense, the surveillance video alone provided slight evidence that, despite Appellant's denials, Appellant did fire his gun and did so in self-defense after Devero pulled a gun on him. But because none of this evidence amounted to Appellant "admitting" that he fired his gun, the charge as given, by stating that an affirmative defense "admits the doing of the act charged," was, at least post-*McClure*, not a "correct, applicable, and complete statement of law." *Morris*, 308 Ga. at 529.

Moreover, the trial court's instructional error was not harmless. The test for nonconstitutional harmless error is whether it is highly probable that the trial court's error did not affect the verdicts. See *Smith v. State*, 299 Ga. 424, 432 (788 SE2d 433) (2016). Here, the prosecutor blatantly and repeatedly misstated the law in his closing argument by telling the jury that it could not consider self-defense unless Appellant admitted that he fired his gun, an

25

argument that directly contravened our holding in *McClure*. See *McClure*, 306 Ga. at 863 ("Trial court error in rejecting requested and applicable affirmative defense instructions may be compounded by prosecutorial argument."). As Appellant argued in renewing his objection to the pattern instruction after the charge was given, "literally, what was warned about in this case [i.e., *McClure*] is what came out in the [State's] closing. It's a – a direct result of not changing the instructions in the charge." By the time the jury was deliberating, it had adopted the prosecutor's misstatement of the law, which became clear when the jury sent a note to the trial court that said, "Your charge said defendant <u>could not</u> claim that [i.e., self-defense] because he did not admit to shooting [his] firearm." (Emphasis in original.)

The court's response to the jury – "I did not say whether or not the defendant *admitted* to shooting the firearm. That is a question of fact you *must* find." (emphasis added) – arguably made matters worse by suggesting that in order to find that Appellant acted in self-defense, the jury had to determine whether Appellant ever admitted

26

to firing his gun. At the very least, the court's response did nothing to remedy the misleading "admits the doing of the act charged" language contained in the pattern jury instruction. Thus, we cannot say that it is highly probable that the court's instructional error did not contribute to the verdicts.[6] Accordingly, we reverse Appellant's conviction and sentence for felony murder. However, because the evidence was legally sufficient to sustain the jury's guilty verdicts, the State may choose to retry Appellant. See *Harris v. State*, 314 Ga. 238, 289 (875 SE2d 659) (2022).

*Judgment reversed. All the Justices concur.*

---

[6] We note that the State did not request – and the trial court did not give – an instruction informing the jury that purchasing any amount of marijuana is a felony. See OCGA § 16-13-30 (j). See also *Boothe v. State,* 293 Ga. 285, 290 n.9 (745 SE2d 594) (2013) ("[H]armless error must be assessed based on the review of the record of the trial whose verdict is challenged on appeal . . . ."). Cf. OCGA § 16-13-2 (b) ("Notwithstanding any law to the contrary, any person who is charged with possession of marijuana, which possession is of one ounce or less, shall be guilty of a misdemeanor . . . .").