318 Ga. 312
FINAL COPY

S23A1042. FLOYD v. THE STATE.

BOGGS, Chief Justice.

Appellant Darnell Rene Floyd challenges his conviction for felony murder predicated on possession of a firearm by a convicted felon in connection with the shooting death of Telmo Ortiz. At trial, Appellant contended that he acted in self-defense, and he was acquitted of malice murder; felony murder predicated on attempted armed robbery and aggravated assault; and two counts of aggravated assault.[1] On appeal, Appellant challenges only the

---

[1] The crimes occurred on September 9, 2017. On December 1, 2017, a Newton County grand jury indicted Appellant for malice murder, a single count of felony murder predicated on attempted armed robbery and aggravated assault; attempted armed robbery; two counts of aggravated assault with a deadly weapon (against Ortiz and Casie Croft by brandishing a firearm); fleeing or attempting to elude a police officer; kidnapping; possession of a firearm during the commission of the felonies of "[m]urder," aggravated assault, and attempted armed robbery ("Count 8"); two additional counts of possession of a firearm during the commission of the felony (aggravated assault against Croft and kidnapping); possession of a firearm by a convicted felon; and cruelty to children in the third degree. Appellant was tried before a jury from December 9-17, 2019. In addition to the counts set forth in the indictment, the trial court charged the jury on two offenses under the malice murder count:

felony murder and felon-in-possession convictions. He contends that his trial counsel was constitutionally ineffective in several ways related to counsel's handling of the interplay between self-defense and possession of a firearm by a convicted felon. We agree and accordingly reverse, but because the evidence against him was constitutionally sufficient to authorize the conviction, he may be retried.[2]

felony murder predicated on possession of a firearm by a convicted felon and voluntary manslaughter. The jury found Appellant guilty of felony murder, predicated on felon-in-possession. The jury also found Appellant guilty of possession of a firearm by a convicted felon; fleeing or attempting to elude; a single count of possession of a firearm during the commission of a felony (Count 8); and cruelty to children. The jury acquitted Appellant of all other charges. The trial court sentenced Appellant to serve life in prison with the possibility of parole for felony murder; consecutive terms of five years each for fleeing or attempting to elude and possession of a firearm during the commission of a felony; and a concurrent 12-month term for cruelty to children. The felon-in-possession count merged with the felony murder conviction. Appellant filed a timely motion for new trial, which he subsequently amended with new counsel on March 8, 2021. After an evidentiary hearing on May 18, 2021, before a successor judge, the trial court entered an order denying the motion on December 5, 2022. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the August 2023 term and orally argued on October 17, 2023.

[2] Appellant also asserts that the trial court abused its discretion in denying his motion to bifurcate the felon-in-possession count from the trial of the other offenses; that the trial court erred in charging the jury on felony murder based on felon-in-possession as a lesser included offense of malice murder; and that the trial court committed plain error in failing to charge the jury that self-defense shall be an absolute defense to possession of a firearm by

2

1. The evidence presented at trial showed the following.[3] The shooting took place on September 9, 2017, at the home of Caitlyn Croft and her twin sister, Casie Croft, who was Ortiz's girlfriend. Caitlyn and Casie were present at the time, as was Destiny Welch, a mutual friend of everyone present.

Over a year before the shooting, Appellant, who was a convicted felon,[4] was at a bar and encountered Ortiz for the first time. Words were exchanged between Appellant's friends and Ortiz's friends, and Ortiz and one of his friends left the bar and retrieved guns from a car. As Appellant and a friend left the bar, Ortiz and his friend approached Appellant with guns in their hands and made threatening gestures toward Appellant and Appellant's friend. Appellant's friend pulled him away, and they got into

---

a convicted felon. Because we reverse and because these alleged errors are either moot or unlikely to arise again upon retrial, we do not address them.

[3] Because of the analysis of prejudice undertaken in Division 2, we set out the evidence in detail, and "we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." *Moore v. State*, 315 Ga. 263, 264 n.2 (882 SE2d 227) (2022) (cleaned up).

[4] Prior to trial, the parties agreed to stipulate to Appellant's status as a convicted felon, and at trial, Appellant testified that he was a convicted felon. His prior conviction was not introduced into evidence.

Appellant's car and left. About a week later, Appellant saw Ortiz again at the bar and told him, "[Y]ou can't be out here pulling guns on people because everyone is not just going to bow down." Ortiz responded, "I don't give a f**k, I'm just the type of motherf**ker that you just going to have to bust me." The two continued to talk for a short while longer, and then Appellant went to a different area of the bar.

About a month before the shooting occurred, Welch told Appellant that Ortiz was offering to sell a gun, and Appellant and Ortiz met at Casie and Caitlyn's house to discuss the purchase. Appellant declined to buy the gun because Ortiz had raised the price of the gun from the earlier price he had quoted Welch. A short time after this encounter, Ortiz's brother, or another person, stole cell phones from Welch and a friend of Welch's; Ortiz later came into possession of the phones.[5] Welch's friend, with the assistance of

---

[5] The evidence was conflicting as to whether Ortiz's brother stole the phones, or another individual stole the phones and then gave them to Ortiz's brother.

4

Casie, was able to recover her phone from Ortiz by paying him for it, and Ortiz likewise told Welch she would have to pay him to get her phone back. Welch then communicated with Casie and Caitlyn to try to recover the phone, but she was unable to get her phone back.

At about 10:30 p.m. on the night the shooting occurred, Appellant and Welch drove to the house where Casie and Caitlyn lived so that Welch could try to get her phone back. When Appellant and Welch arrived at the house, Appellant parked his SUV facing the street, between the unpaved driveway and a large tree near the front porch of the house. Welch stepped out of the SUV and spoke to Caitlyn, who was on the front porch. Welch told Caitlyn that she wanted to get her phone back and wanted to speak to either Casie or Ortiz about it. Caitlyn told Welch that Casie and Ortiz were not there, but Caitlyn contacted Ortiz to tell him that Appellant and Welch were at the house. Caitlyn then went over to the SUV and visited with Welch's child, who was in a car seat in the back seat. Caitlyn saw a "shotgun" in the back seat.

5

Shortly thereafter, Ortiz and Casie returned, drove past the SUV, and parked behind the house. Before Casie and Ortiz exited the car, she handed him a handgun, and he put it in the waistband of his shorts. Ortiz walked to the SUV on the driver's side where Appellant was sitting, and Casie walked to the passenger side of the SUV. Caitlyn returned to the front porch. The witnesses provided conflicting pretrial statements and testimony about what happened next.

According to Appellant's testimony at trial, he drove Welch and her child to Caitlyn and Casie's house, believing that Welch was going to be dropping her child off with Caitlyn and Casie to babysit. Although he was aware that Ortiz had Welch's stolen cell phone, he did not know that Ortiz lived there as well. When Ortiz arrived at the house, Ortiz approached the driver's side window and asked, "[W]hat's up." Appellant asked Ortiz about Welch's cell phone, and Ortiz responded that he had paid for it and that if Appellant wanted it back, he would have to pay for it. Appellant accused Ortiz of robbing women for cell phones and saw Ortiz lift the hem of his shirt

6

and reach for a firearm in his waistband. Appellant then opened the car door to deflect the gun and stepped out of the car, carrying a nine-millimeter handgun in his pocket and another handgun in his waistband. The door hit Ortiz, who started pulling out his gun and lunging at Appellant, but Ortiz's gun seemed to get "stuck on something." Appellant pulled the nine-millimeter gun out of his pocket and fired at Ortiz. Appellant did not point his gun at Ortiz's face or tell Ortiz to "run [his] pockets." When Appellant saw Ortiz with the gun in his hand and trying to pull it out of his waistband, Appellant feared for his life; after Appellant fired one shot, Ortiz continued to pull his gun out. Appellant fired another shot, and Ortiz began to turn and run away, but Ortiz started to turn back, and Appellant could see the gun "all the way out." Appellant then fired a third shot.

Appellant's account was contradicted by Caitlyn's statements and testimony. Caitlyn made several statements at the scene to officers, which were audio- and video-recorded on officers' body cameras; a portion of the videos was played for the jury. When the

7

first officer arrived at the scene in response to a 911 call, Caitlyn said she had not seen anything. A few minutes later, in response to questions from another officer, Caitlyn said she could explain what happened. She said that Ortiz bought a phone that had been stolen from Welch. She told the officer that Appellant demanded the phone from Ortiz and threatened him if he did not give Appellant the phone and that Ortiz said he did not have it and told Appellant to "check my pockets." Then Ortiz started running, at which point Appellant shot him. Later, after Caitlyn and Casie had been in the house together outside of the officers' presence, an officer asked Caitlyn to come out to the porch and "walk me through it." In this conversation, Caitlyn's description of the events was that Appellant confronted Ortiz about the phone and then tried to rob Ortiz, and Appellant pulled a gun first. Ortiz pulled out his gun in response to Appellant's threat to rob him, and Appellant told him, "Run your pockets." Ortiz responded, "[N]o," and started to run toward the house, and Appellant shot him in the back as he ran. Later that evening, in

response to a request to give a statement at the police station, Caitlyn said "I didn't see it, only my sister did."

In her trial testimony, Caitlyn said that she was on the front porch when Ortiz and Casie were standing by Appellant's SUV; that it was dark; and that there was some lighting allowing her partially to see Ortiz and Casie, although the railing around the front porch blocked her view in part. She did not hear the conversation between Appellant and Ortiz until Appellant raised his voice. She saw Appellant exit the car and pull a gun. Then she saw the door hit Casie, who was standing next to Ortiz. Caitlyn saw Appellant point the gun at Ortiz's head and heard Appellant tell Ortiz to empty his pockets. She also testified that Ortiz was holding his hands at his side with his palms out and told Appellant he would not empty his pockets. Appellant then told Ortiz he would shoot, and Ortiz responded, "[S]hoot." Appellant then shot Ortiz and fired the gun two more times. Caitlyn said she heard Ortiz fall, she did not see Ortiz holding his gun or gesture as if he were going to pull a gun, and she did not hear Ortiz threaten Appellant.

9

On the evening of the shooting, Casie gave a statement to officers at police headquarters; this statement was audio-recorded and played for the jury. According to Casie, when she and Ortiz heard Appellant and Welch were at Casie's house, she believed it was about Welch's cell phone. When she and Ortiz arrived back at the house, they walked up to the driver's side of Appellant's car; Ortiz had his gun "behind his pants" at the time. Appellant asked Ortiz where the phone was, demanded that Ortiz give it to him, said he was not going to pay for it, and asked why Welch should have to pay for her own phone. Ortiz responded that he had paid for it and did not know it had been stolen. Appellant then jumped out of the SUV with a pistol and told Ortiz to empty his pockets. Ortiz said he would not do that and that he did not have the phone, and Appellant said, "I don't care, empty your pockets." Ortiz did not pull out his gun, but said, "[B]ro, you goin' have to bust"; Appellant replied, "I'm fixin' to bust at you." Appellant then fired at Ortiz. Ortiz turned and started to run, and Appellant continued to shoot. Casie believed that Ortiz's gun fell out of his waistband when he fell to the ground.

In Casie's trial testimony, she stated that Welch's phone had been stolen; that Ortiz had subsequently bought the phone; and that Ortiz was trying to make money from Welch by selling her phone back to her because Welch owed him money for drugs. Casie was standing by the driver's side of the SUV when Ortiz was talking to Appellant about the cell phone. When Ortiz refused to return the phone, Appellant's tone of voice changed, and he opened the SUV door, knocking Casie to the ground. Appellant had a "pistol" in his hand. Casie stood up behind Ortiz, and Appellant, with the gun pointed at Ortiz's face, told Ortiz to "empty your pockets or I'll shoot you." Ortiz had his hands up, but when he moved his arm "a little bit," Appellant shot him. Ortiz turned to run away, and Appellant shot him two more times. When Ortiz fell to the ground, his gun fell out of his waistband.

According to Welch's statement to police on the night of the shooting, which was audio- and video-recorded and played for the jury, Appellant asked Ortiz if he would give Welch back her phone, and Ortiz said she could buy it back. Appellant and Ortiz continued

11

to talk about the phone, and Ortiz said that if Welch did not pay for the phone, then he had nothing for them. Appellant pulled out a gun and although Welch could not really see what was happening and did not see the gun, she guessed that Ortiz reached for a gun and then she heard three shots fired. Then Appellant drove away very quickly, and Appellant told her that Ortiz had pulled a gun on him and tried to rob him. Law enforcement officers began to pursue the SUV, and during the high-speed chase that ensued, Appellant spoke with someone on the phone and told that person he shot someone who had tried to rob him.

In her trial testimony, Welch stated that Ortiz and Appellant argued loudly about the phones, with Ortiz saying he needed to be paid for it. Ortiz was the first to pull a gun, and he had a gun in his hand as he argued with Appellant.[6] She heard the gunshots and saw

---

[6] Welch testified that she was not truthful in her recorded pretrial statement because she was scared that her child would be taken away from her and that before the cameras were turned on in the interview room, officers suggested that she could be charged with a crime and that she would serve more time if she said that she saw Ortiz with a gun. She also testified that when she was interviewed by an investigator with the prosecutor's office, she

Ortiz on the ground, and then Appellant got back in the SUV. Welch also testified that prior to the trial, Casie told her that Ortiz "did kind of have [the gun] out," but Casie "didn't think he was going to."

After the shooting, Appellant and Welch drove away, with Welch's child still in the car. Police officers in the area heard the gunshots, saw Appellant's SUV drive by at a high rate of speed and without the lights on, began to pursue the vehicle, and attempted to initiate a traffic stop. Appellant did not stop and led officers on an approximately 15-to-20-minute high-speed chase, which ended when officers conducted a "PIT maneuver." Appellant put his hands outside of the car window, asked officers not to shoot, and told them there was a baby in the car. As he was removed from the SUV, Appellant told officers he had a .40-caliber handgun in his front waistband; that gun was in a holster. Officers took possession of the holstered gun, as well as two additional firearms from the SUV — a

told the investigator that Ortiz had a gun; that the investigator did not appear to like that answer; and that when she was interviewed by the prosecutor, the prosecutor told her she could be charged with giving a false statement to officers or with perjury if she lied while testifying.

13

nine-millimeter handgun from underneath Appellant's seat and an AR-15 rifle from the back seat.

Meanwhile, back at the crime scene, a neighbor who had heard gunshots and screaming arrived at the house before law enforcement officers arrived. He testified that when he approached the house, Casie was sitting on the ground next to Ortiz. When the neighbor reached toward Ortiz to see if Ortiz was breathing or had a pulse, he saw a handgun lying on the ground between Ortiz's right hand and his waist; the neighbor picked up the gun, moved it away from Ortiz's body, and when a law enforcement officer arrived on the scene, the neighbor pointed out where he had placed the gun. The officer cleared a bullet from the chamber of the gun.

Testimony from the medical examiner, a firearms expert, and an officer established that Ortiz suffered three gunshot wounds — one to the abdominal area, one to the back of his right arm, and one to his upper back. The testimony also established that two of the wounds were caused by bullets fired from the nine-millimeter handgun recovered from Appellant's car.

14

We have reviewed the record and conclude that, viewed in the light most favorable to the verdict, the evidence presented at trial was constitutionally sufficient to authorize a rational jury to find beyond a reasonable doubt that Appellant was guilty of felony murder predicated on possession of a firearm by a convicted felon and possession of a firearm during the commission of a crime. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).[7]

2.     Appellant contends (asserting interrelated arguments) that his trial counsel was constitutionally ineffective for failing to request a jury instruction about self-defense under OCGA § 16-11-138. That statute provides that "[d]efense of self or others, as contemplated by and provided for under Article 2 of Chapter 3 of this title, shall be an absolute defense" to various statutes

---

[7] Appellant does not challenge the legal sufficiency of the evidence supporting his conviction for felony murder and does not challenge his other convictions. However, we address the sufficiency of the evidence of the conviction for felony murder predicated on felon-in-possession because this issue affects the ability of the State to retry him. See *Heard v. State*, 309 Ga. 76, 83 n.10 (844 SE2d 791) (2020).

criminalizing the carrying and possession of firearms in specified ways, including prohibiting the possession of firearms by a convicted felon. See OCGA § 16-11-131 (b). OCGA § 16-11-138 became effective in 2014, see Ga. L. 2014, p. 599, § 1-10,[8] three years before the shooting and five years before the trial of this case. We have previously explained that OCGA § 16-11-138 "potentially justif[ies] not only threats or uses of force . . . but also the possession or carrying of a weapon in violation of Title 16, Chapter 11, Article 4, Part 3." *Johnson v. State*, 308 Ga. 141, 145 (839 SE2d 521) (2020).[9] Thus, under this statute, if the jury believed that Appellant was acting in self-defense when he shot Ortiz, the jury was required to acquit him of felony murder based on felon-in-possession. See generally *State v. Remy*, 308 Ga. 296, 300 (840 SE2d 385) (2020) (stating that under OCGA § 16-11-138, if defendant, who was

---

[8] OCGA § 16-11-138 was amended in a non-substantive way in 2015. See Ga. L. 2015, p. 9, § 16.

[9] Prior to the enactment of OCGA § 16-11-138, justification was not generally available as a defense for a convicted felon in possession of a gun, although our case law recognized an exception "where, upon a sudden emergency, one suddenly acquires actual possession of a pistol for the purpose of defending himself." *Copeland v. State*, 316 Ga. 452, 456 n.3 (888 SE2d 517) (2023) (cleaned up). See also *Johnson*, 308 Ga. at 143 n.5.

16

convicted felon, was acting in self-defense at the time of the shooting, "it cannot be said that he was committing a felony when he shot [the victim]." (cleaned up)).

The additional facts relevant to this claim are as follows. Although Appellant was not indicted for felony murder based on felon-in-possession, on the first day of the trial, the State requested that the jury be charged that it could find Appellant guilty of felony murder based on felon-in-possession, as a lesser-included offense of malice murder, and the trial court so instructed the jury. Appellant's sole defense was that he was acting in self-defense when he shot Ortiz.[10] However, Appellant's trial counsel did not request a jury instruction on OCGA § 16-11-138 and acknowledged during the motion for new trial hearing that he was unfamiliar with OCGA § 16-11-138 at the time of the trial.[11]

During closing arguments, trial counsel told the jury that

---

[10] Although the trial court charged the jury on voluntary manslaughter, Appellant's trial counsel relied solely on self-defense in his closing arguments and did not request that the jury consider voluntary manslaughter.

[11] The trial court did not discredit trial counsel's testimony on this point.

17

Appellant was guilty of felon-in-possession and that self-defense did not apply to the felon-in-possession count. Trial counsel argued, "You're absolved of criminal responsibility if you are reasonably defending yourself. What he's not able to apply to is clearly the possession of a firearm by a convicted felon and fleeing the officers." Trial counsel did not explain that Appellant was justified in possessing the gun at the time he shot Ortiz if Appellant was acting in self-defense. In contrast, trial counsel argued that self-defense applied to felony murder predicated on attempted armed robbery and aggravated assault.

In the morning of the second full day of its deliberations, the jury sent out the following note:

> Can [Appellant], as a convicted fellon [sic] with a weapon, be justified to use a weapon (gun) to defend himself if he fears for his life?

> In the eyes of Georgia law what has presidence [sic]:
> - self defense (at all costs)
> - fellon [sic] in possession of a weapon defending himself

During a brief discussion with the parties, the trial court indicated its understanding of the note as asking "can a felon grab a gun and

18

shoot somebody in self-defense and does the self-defense still apply in that situation," and that the answer to that question was "yes." With the parties' agreement, the trial court wrote under the first question, "Yes if he reasonably fears for his life." The trial court then told the parties that in response to the second question posed, he wrote, "That is an issue for you to decide." Trial counsel responded "correct" and stated he had no objection to the answer as given. The note, with the trial court's written responses, was returned to the jury, and the trial court did not address the jury in person. That afternoon[12] the jury returned its verdicts, finding Appellant not guilty of malice murder, aggravated assault against Ortiz, and felony murder predicated on aggravated assault and attempted armed robbery, but finding him guilty of felony murder predicated on felon-in-possession, as well as on some of the indicted crimes. See

---

[12] After the trial court responded to the jury's question and before the jury returned its verdicts, the jury sent out another note, stating that it could not reach a unanimous verdict on felony murder predicated on felon-in-possession but that it had reached a unanimous decision on all other counts. In response, the trial court charged the jury on further deliberations. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.70.70 (4th ed. 2007) (Jury (Hung)).

footnote 1 above.

To establish that his trial counsel was constitutionally ineffective, Appellant must prove both deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that his attorney's acts or omissions were "objectively unreasonable . . . considering all the circumstances and in the light of prevailing professional norms." *Davis v. State*, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). The law recognizes a "strong presumption" that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. *Strickland*, 466 U.S. at 689. To carry this burden, Appellant must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Washington v. State*, 313 Ga. 771, 773 (873 SE2d 132) (2022) (cleaned up). To establish the required prejudice, Appellant must show that but for his attorney's unprofessional errors, there is a reasonable probability that the result of the proceeding would have

been different. See *Davis*, 299 Ga. at 183. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

(a) *Deficiency prong.* As noted above, the record establishes that trial counsel's lack of understanding of the law governing a convicted felon's statutory right to use a firearm in self-defense underlies his failure to request a charge on OCGA § 16-11-138, his failure to argue that self-defense applied to felony murder based on felon-in-possession, and his agreement with the trial court's response to the jury's second question. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (134 SCt 1081, 188 LE2d 1) (2014). While counsel's decisions based on a misunderstanding of the applicable law are not per se deficient, "a defendant can carry his burden of showing deficiency if, under the circumstances, the challenged action cannot be considered a sound trial strategy."

21

*Swanson v. State*, 306 Ga. 153, 158 (829 SE2d 312) (2019) (cleaned up) (concluding that trial counsel performed deficiently in failing to request a jury charge on defense of habitation, when that defense was expressly authorized by statute and applicable to the defendant's defense of justification). Here, trial counsel testified at the hearing on the motion for new trial that while it was his strategy to concede Appellant's guilt for felon-in-possession, he did not have a clear understanding about how to structure the argument in light of the trial court's decision to instruct the jury on felony murder predicated on felon-in-possession; he also had no strategic reason for failing to request an instruction on OCGA § 16-11-138. And there is nothing in the record or our case law that would support the conclusion that under these particular circumstances, it could be a reasonable strategic decision to fail to ensure that the jury knew — either through an explicit instruction on OCGA § 16-11-138 or through clear argument — that Appellant had an absolute defense to felony murder predicated on felon-in-possession if the jury

22

believed that the shooting was in self-defense.[13] See id.; *Benham v. State*, 277 Ga. 516, 517-518 (591 SE2d 824) (2004) (trial counsel's failure to request defense-of-habitation instruction was due to counsel's failure to understand the available defenses and constituted deficient performance).

Moreover, the jury's note indicated that there was confusion about the application of self-defense to felony murder and felon-in-possession. See generally *Reese v. State*, 314 Ga. 871, 872, 882 (880 SE2d 117) (2022) (recognizing that jury note indicated jury was misled by misstatements of law in closing arguments); *Flood v. State*, 311 Ga. 800, 805-807 (860 SE2d 731) (2021) (where jury was charged on malice murder and lesser included offense of voluntary manslaughter, recognizing that jury confusion was indicated by

---

[13] Trial counsel testified at the motion for new trial hearing that because Appellant had two additional guns in the SUV, conceding Appellant's guilt for felon-in-possession was a way to build credibility with the jury. We have recognized that a similar concession may fall within the bounds of reasonable professional assistance. See, e.g., *Anthony v. State*, 311 Ga. 293, 298 (857 SE2d 682) (2021) (counsel's strategic decision to concede in closing argument that his client was guilty of lesser charges and to focus on argument that his client was not guilty of malice murder was not deficient performance). But as described above, the circumstances here are not analogous to the facts of *Anthony*.

23

jury's note stating that 11 jurors were considering convicting the defendant on "lesser charge of felony murder" or on involuntary manslaughter). The confusion is evident here because despite being instructed by the trial court that "[t]he fact that a person's conduct is justified is a defense to prosecution for any crime based on that conduct," the jury asked whether Appellant, as a convicted felon, could be justified to use a gun in self-defense.[14]

In the face of this evident jury confusion, the trial court's response to the second question — "[t]hat is an issue for you to decide" — did nothing to clarify the confusion, regardless of how the question is interpreted.[15] If, as the State suggests on appeal, the second question is duplicative of the first, then providing different responses to the same question is obviously incorrect. If, however, the second question is read as asking whether the jury may convict

---

[14] Trial counsel's argument that self-defense did not apply to felon-in-possession likely contributed to the jury's confusion.

[15] At trial, there was no discussion about the meaning of the second question, and trial counsel testified at the motion-for-new-trial hearing that he did not "know what the jury was asking" in the second question.

on felon-in-possession even if it finds Appellant acted in self-defense, the response utterly failed to inform the jury that Georgia statutory law provides an absolute defense to felony murder based on felon-in-possession if the jury believed that Appellant acted in self-defense. See OCGA § 16-11-138. Finally, regardless of exactly how the jury's second question is understood, the two questions themselves signaled that the jury was confused by the concession that Appellant was a convicted felon and not permitted to possess a gun and the claim that he was justified in using a gun in self-defense. Especially given that self-defense was Appellant's sole defense to felony murder based on felon-in-possession, we conclude that no reasonable attorney would have agreed with the trial court's response to the jury's second question, which at best was a non-answer, and at worst, authorized the jury to convict on felony murder based on felon-in-possession even if it believed Appellant's claim of self-defense. See generally *Reese*, 314 Ga. at 879-883 (reversing conviction where trial court's instructions on defendant's affirmative defense of justification were erroneous and trial court's

25

response to jury's note indicating confusion about those instructions did not remedy the error); *Hall v. Wheeling*, 282 Ga. 86, 87 (646 SE2d 236) (2007) (failure to object to erroneous jury instruction that allowed jury to convict on manner not alleged in indictment was deficient performance). Compare *Collins v. State*, 312 Ga. 727, 749-752 (864 SE2d 85) (2021) (trial counsel's agreement that jury question asking "Rule of Law Question" should not be answered was not unreasonable strategic decision, where counsel indicated that initial instructions covered principles outlined in question and written copy was given to jury); *Stepp-McCommons v. State*, 309 Ga. 400, 407 (845 SE2d 643) (2020) (failure to object to trial court's legally correct response to jury question was not deficient performance).

Accordingly, we conclude that trial counsel's failure to request a charge on OCGA § 16-11-138, coupled with his failure to clearly explain that self-defense applied to felony murder based on felon-in-possession and his agreement with the trial court's response to the jury's second question, constitutes deficient performance.

(b) *Prejudice prong*. "Jury instructions are the lamp to guide the jury's feet in journeying through the testimony in search of a legal verdict." *Henry v. State*, 307 Ga. 140, 146 (834 SE2d 861) (2019) (cleaned up). Given the importance of correctly instructing the jury on the issues critical to a proper understanding of a defendant's theory of defense, trial counsel's failure to request appropriate jury instructions and to object to a trial court's incorrect response to a jury note is prejudicial if but for the errors, there is a reasonable probability that the result of the proceeding would have been different. See, e.g., *Swanson*, 306 Ga. at 161-162 (determining that trial counsel's deficient performance in failing to request instruction on defense of habitation was prejudicial); *Benham*, 277 Ga. at 518 (same). See also *Henry*, 307 Ga. at 146 (instructional error related to defense of justification was harmful); *Woods v. State*, 291 Ga. 804, 810-811 (733 SE2d 730) (2012) (instructional error that deprived jury of "proper guidelines for determining guilt or innocence" was harmful and reversible error (cleaned up)); *Price v. State*, 289 Ga. 459, 461-462 (712 SE2d 828) (2011) (instructional error that "failed

to fairly present [Appellant's] defense to the jury" was harmful and reversible error (cleaned up)).

Here, Appellant testified that he acted in self-defense, self-defense was the only defense proffered, and the jury acquitted him of the other offenses arising out of the shooting of Ortiz for which self-defense was asserted — malice murder, felony murder based on aggravated assault, and aggravated assault. In addition, the jury note indicated that the jury was contemplating whether Appellant's claim of self-defense could apply to the felon-in-possession charge and was confused about the subject. However, counsel's deficiencies deprived the jury of understanding that OCGA § 16-11-138 provided an absolute defense to felony murder predicated on felon-in-possession if it believed that Appellant was acting in self-defense when he shot Ortiz. And viewing the jury instructions as a whole, including the responses to the jury's questions that indicated its confusion, the jury was not otherwise clearly instructed that it was required to acquit Appellant of felony murder based on felon-in-possession if it believed he was acting in self-defense. Under these

28

unique facts, we conclude that Appellant has met his burden of showing that but for the cumulative effect of counsel's deficiencies, there is a reasonable probability that the outcome of the trial would have been different.

Accordingly, we reverse Appellant's convictions and sentence for felony murder and possession of a firearm by a convicted felon.

3. Because we are reversing the felony murder conviction, which is the only conviction supporting the conviction for Count 8, possession of a firearm during the commission of a felony, we also reverse that conviction. See *King v. Waters*, 278 Ga. 122, 123-124 (598 SE2d 476) (2004) (habeas court erred in failing to vacate weapons possession conviction when predicate was vacated). Compare *Mason v. State*, 279 Ga. 636, 639 (619 SE2d 621) (2005) (alleged erroneous jury instruction on aggravated assault would not require reversal of weapons possession offenses under *King v. Waters* where those offenses could be predicated on alternative convictions).

Because, as discussed in Division 1 above, the evidence was

legally sufficient to support the jury's guilty verdicts, the State may retry Appellant for felony murder predicated on felon-in-possession as well as for possession of a firearm during the commission of a felony. See *Heard v. State*, 309 Ga. 76, 83 n.10 (844 SE2d 791) (2020).[16]

*Judgment reversed in part. All the Justices concur.*

LaGrua, Justice, concurring.

I agree with the majority opinion that our prior cases on ineffective assistance of counsel and felony murder require reversal here, so I concur. Under OCGA § 16-11-138, Appellant indeed had an absolute defense to felony murder predicated on possession of a

---

[16] We express no opinion as to whether the State may reindict Appellant on these charges. See, e.g., *McCrary v. State*, 252 Ga. 521, 525 (314 SE2d 662) (1984) (reversing conviction on charge of felony murder based on robbery where underlying robbery charge was not included in indictment, and noting State could reindict) ("*McCrary I*"); *McCrary v. State*, 254 Ga. 382, 382-383 (329 SE2d 473) (1985) (after *McCrary I* and reindictment on felony murder predicated on aggravated assault, holding, in part, that retrial under new indictment did not violate double jeopardy). Compare *Price v. Georgia*, 398 U.S. 323, 324-325, 329-330 (90 SCt 1757, 26 LE2d 300) (1970) (holding, in part, that retrial under original indictment for malice murder violated double jeopardy, where first jury returned guilty verdict only as to voluntary manslaughter as lesser included offense of malice murder).

firearm by a convicted felon if the jury believed that he shot Ortiz in self-defense. See *Johnson v. State*, 308 Ga. 141, 145 (839 SE2d 521) (2020); *State v. Remy*, 308 Ga. 296, 300 (840 SE2d 385) (2020). I write separately because the jury's confusion over the interplay between self-defense and possession of a firearm by a convicted felon is understandable. I question whether OCGA § 16-11-138 was intended to protect felons who intentionally arm themselves and then use those weapons in situations like this. If that was not the intent, the General Assembly should clarify the statute. Nonetheless, that is where the law stands, so we must apply it.

I am authorized to state that Justice Colvin joins in this concurrence.

Decided February 20, 2024.

Murder. Newton Superior Court. Before Judge Foster.

*Matthew K. Winchester; McLendon Law Firm, Jason M. McLendon*, for appellant.

*Randal M. McGinley, District Attorney, Bailey R. Simkoff, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Senior Assistant Attorney General, Emily R. Polk, Assistant Attorney General*, for appellee.